**CONCORD BOAT CORPORATION,
et al., Plaintiffs,**

v.

**BRUNSWICK CORPORATION,
Defendant.**

**No. LR–C–95–781.**

United States District Court,
E.D. Arkansas,
Western Division.

Aug. 20, 1998.

K. Craig Wildfang, Brooks F. Poley, Christopher W. Madel, Winthrop & Weinstine, Minneapolis, MN, Jerry C. Jones, Amy Lee Stewart, Rose Law Firm, Little Rock, AR, for plaintiffs.

Robert F. Finke, Mark McLaughlin, Andrew S. Marovitz, Mayer, Brown & Platt, Chicago, IL, William H. Sutton, James M. Simpson, Jr., Friday, Eldredge & Clark, Little Rock, AR, for defendant.

## *ORDER*

MOODY, District Judge.

Before the Court are Defendant Brunswick Corporation's Renewed Motion for Judgment as a Matter of Law Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure and separate Motion for a New Trial. For the reasons set forth herein, the motions will be DENIED.

### I.

Plaintiffs, a group of twenty-one boat manufacturers and their buying cooperative, Independent Boat Builders Incorporated ("IBBI"), brought this action against Brunswick Corporation ("Brunswick") alleging that Brunswick engaged in a variety of anticompetitive conduct with respect to the market for stern drive and inboard marine engines.[1]

Plaintiffs alleged violations of Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. Specifically, Plaintiffs claimed that Brunswick engaged in a multifaceted anticompetitive scheme that included

1. Brunswick manufactures MerCruiser stern drive engines. The Court will refer to "Brunswick" and "MerCruiser" interchangeably.

the following unlawful practices: (1) the use of various exclusionary discount programs in the sale of stern drive and inboard marine engines to boat manufacturers; (2) the use of various exclusionary discount programs in the sale of stern drive and inboard marine engines to boat dealers; (3) the use of long-term contracts in the sale of stern drive and inboard marine engines; (4) the acquisitions of the boat manufacturers Ray Industries (Sea Ray), U.S. Marine (Bayliner), and Baja; and (5) the acquisitions of the engine manufacturers BMW Marine Diesel, Kiekhaefer Aeromarine and Force. Plaintiffs also alleged that Brunswick fraudulently concealed its anticompetitive acts.

Brunswick counterclaimed against the Plaintiffs who purchased stern drive engines, alleging that those Plaintiffs engaged in an unlawful group boycott. Brunswick alleged that Plaintiffs conspired to boycott MerCruiser stern drive engines at industry boat shows and conspired to price MerCruiser engines at a disadvantage to MerCruiser's competitors. Brunswick also brought three state law counterclaims against Plaintiffs G.W. Invader and KCS International relating to the alleged submission of falsified market share affidavits.

The trial commenced on April 13, 1998 and lasted ten weeks. The jury returned a verdict on June 19, 1998, after a day-and-a half of deliberations. The verdict defined the relevant market as the market for stern drive and inboard marine engines. The jury found for Plaintiffs on all three of the antitrust claims, finding that Brunswick had monopolized the market for stern drive and inboard marine engines; that Brunswick engaged in unreasonable restraints of trade in violation of Section 1 of the Sherman Act; and that Brunswick engaged in acquisitions in violation of Section 7 of the Clayton Act. The jury awarded damages of $44.4 Million on the antitrust claims.[2] In addition, the jury returned a verdict for Plaintiffs on Brunswick's antitrust counterclaim and for G.W. Invader and KCS International on the three state law counterclaims.

## II.

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) poses the legal question as to whether sufficient evidence was presented to support a jury verdict. *Gray v. Bicknell,* 86 F.3d 1472, 1478 (8th Cir.1996). The motion is properly granted only if the nonmoving party has not offered sufficient evidence to support a jury verdict in its favor. *Parrish v. Immanuel Med. Ctr.,* 92 F.3d 727, 731 (8th Cir.1996); *Gray,* 86 F.3d at 1478; *Abbott v. Crocker, Mo.,* 30 F.3d 994, 997 (8th Cir.1994). Before ruling on such a motion, a court must (a) resolve direct factual conflicts in favor of the nonmovant; (b) assume as true all facts supporting the nonmovant that the evidence tended to prove; (c) give the nonmovant the benefit of all reasonable inferences; and (d) deny the motion if the evidence would allow reasonable jurors to differ as to the conclusions that could be drawn. *Parrish,* 92 F.3d at 731; *Gray,* 86 F.3d at 1478; *Sherlock v. Quality Control Equip. Co.,* 79 F.3d 731, 735 (8th Cir.1996). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible to no reasonable inference sustaining the position of the nonmoving party." *Kehoe v. Anheuser–Busch, Inc.,* 96 F.3d 1095, 1100 (8th Cir. 1996) (quoting *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996)).

## III.

Brunswick argues that Plaintiffs are seeking damages for conduct which is not anticompetitive or has been excluded from the case. This "disaggregation" argument is based upon the well-settled principle that an antitrust plaintiff is not entitled to recover for losses due to factors other than the defendant's anticompetitive acts. *Amerinet Inc. v. Xerox Corp.,* 972 F.2d 1483 (8th Cir. 1992).

In order to place Brunswick's disaggregation argument in context, some explanation of Plaintiffs' damage model is necessary. Plaintiffs' expert, Dr. Robert Hall, provided the damage testimony for Plaintiffs at trial.

---

**2.** The jury rejected Plaintiffs' claim of fraudulent concealment, thus limiting damages to the beginning of the limitations period, December 7, 1991.

The jury also rejected Plaintiffs' claims for prospective damages. After trebling, the verdict is approximately $133 Million.

Following his discussion of the alleged anticompetitive conduct, Dr. Hall testified that in order to quantify damages, he had to consider "what the market would have looked like without the conduct." Tr. at 1256. This analysis, commonly termed a "but for" analysis, required Dr. Hall to opine on the structure of the market and the market share of the participants in the absence of the conduct alleged to be anticompetitive. As a prelude to his damages testimony, Dr. Hall described the hypothetical "but for" market:

> These are my conclusions as an economist about how the market would be different. We'll be talking more about how I reached these conclusions, but the conclusions are: today Brunswick's share of sterndrive market is around 80 percent—75 to 80 percent. In this market without exclusionary acts, I believe that market share would be about 50 percent. It's not that Brunswick would not be in the market. Its role in the market would be smaller. Other rivals would be there, at least one other, taking up the other half the market there to give a good deal to compete against Brunswick.

Tr. at 1258. Thus, Dr. Hall essentially opined that in the "but for" market, Brunswick and at least one other engine manufacturer would each have approximately 50 percent of the relevant market.

Another key component to Dr. Hall's damage model is the economic model Dr. Hall used to derive his damage opinion, the Cournot model. In the Cournot model, competition is based on changing levels of output; each firm assumes that its rivals will produce a certain quantity of output and then selects its own profit-maximizing level of output. The Cournot model predicts that as the number of firms competing in a market increases, the relative concentration of the market decreases and the equilibrium price falls towards the competitive level.

Dr. Hall used the Cournot model to determine the average price in a competitive market for stern drive and inboard engines and then subtracted that price from an average actual price to determine an average overcharge per engine. One of the primary inputs into the Cournot model is market share. Consistent with Dr. Hall's opinion of the hypothetical market, if a market share of 50% is inserted into the formula, the model predicts no overcharge. However, as actual market share rises above 50%, the model predicts an overcharge, and the amount of the overcharge correspondingly increases the higher the share rises.

Brunswick contends that the damage model is fundamentally flawed for two reasons. First, according to Brunswick, events occurred in the actual market (the "real market") which were completely unrelated to any anticompetitive activity and resulted in market share gains for MerCruiser. Because Dr. Hall's model (the "hypothetical market") does not specifically account for these market share gains, Brunswick contends that the model inherently penalizes Brunswick for market share gains from lawful activity. Second, Brunswick points out that Dr. Hall's initial damage opinion at trial was identical to the opinion from his pre-trial report, even though the Court, prior to trial, had excluded from the jury's consideration two alleged anticompetitive acts which formed the basis of the damage opinion in the report.

## A.

With respect to Brunswick's first argument, evidence was introduced at trial that two "events" in the real market, unrelated to the conduct of Brunswick, accrued to Brunswick's benefit and most likely resulted in some degree of market share gain for MerCruiser. The first event, the Outboard Marine Corporation ("OMC") Cobra recall, received quite a bit of attention throughout the trial. OMC was one of Brunswick's principal competitors in the stern drive business in the 1980's and early 1990's. In 1986, OMC's stern drive engine, the "Cobra," developed a problem with a shift cable which controlled whether the drive unit was in or out of gear. The testimony at trial was that the problem lingered about for some time, and that OMC initially blamed its dealers for the problem. Finally in 1989, OMC was forced to issue a voluntary recall of all of its Cobra engines produced from 1986 through 1989. Dr. Hall agreed that the Cobra problem cost OMC engine sales and resulted in market share gains by MerCruiser.

The second event involved the alleged confusion and mismanagement relating to the joint venture between OMC and Volvo Penta of the Americas ("Volvo"). There was evidence that several boat manufacturers were skeptical of the joint venture in its initial stages and that both Volvo and OMC seemed to compete against each other, despite the joint venture relationship, to their own detriment.

And finally, several witnesses offered evidence of MerCruiser's alleged superior products, outstanding reputation, quality service, and extensive dealer network. No witness was able to empirically quantify any market share gains due to these traits, but Brunswick argued at trial that these characteristics benefitted MerCruiser in the form of increased sales.

The Court notes that the task Dr. Hall faced in analyzing this case was an enormous one. Notwithstanding the complex nature of the conduct at issue, Dr. Hall was required to construct a hypothetical market, a "but for" market, free of the restraints and conduct alleged to be anticompetitive. The difficulty of such a task has long been recognized by courts in antitrust cases because "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).

Dr. Hall unequivocally testified that his 50/50 hypothetical market is a market in which *only* Brunswick's unlawful conduct has been removed. He also testified that he fully considered all of the characteristics of the relevant market before he reached his 50/50 conclusion, including the events which allegedly increased Brunswick's share.[3] And finally, Dr. Hall correctly noted that the creation of the "but for" market required consideration of certain market characteristics that could have prevailed in a more competitive market. Taking all of these factors into account, Dr. Hall opined that in the hypothetical market Brunswick would have fifty percent of the sales. He did not opine that Brunswick would exit the market altogether.

Thus, inherent in Dr. Hall's damage analysis is the notion that Brunswick sells 50% of all stern drive and inboard engines in the relevant market because it is a vigorous competitor with a quality product, a good reputation, and the ability to capitalize on its competitors shortcomings. Dr. Hall has not eliminated those variables from any equation, he has only placed them into a proper frame of reference in a hypothetical competitive market. Dr. Hall testified that he constructed a market in which *only* the unlawful conduct had been removed, and that was all he was required under the law to do.

As Plaintiffs correctly point out, the fundamental flaw in Brunswick's argument is that Brunswick uses the 50% benchmark as the starting point of the analysis and then implies that share gains from the Cobra problem or "quality products" or "superior service" must be added on top of that. In other words, Brunswick assumes that it would have 50% of the hypothetical market *by default*. But, as Dr. Hall testified at trial, that is an inappropriate way to approach his model. Those factors are necessary for Brunswick to reach 50% of the hypothetical market in the first place.

Dr. Hall recognized that his 50/50 prediction is not mathematically precise. He recognized that in a complex market certain events will cause market share to rise and fall. And contrary to Brunswick's assertions, he never testified that every "positive" balances out exactly with every "negative." Dr. Hall's 50/50 opinion is an average, an equilibrium point, for Brunswick's market share in the absence of the unlawful conduct, and the Court does not believe the model inappropriately incorporates lawful conduct into its analysis.

**B.**

■ Next, Brunswick argues that Dr. Hall's damage opinion is based upon certain alleged conduct which was excluded from the jury's consideration prior to trial. Dr. Hall's expert report set forth an initial damage opinion based upon the conduct alleged to be unlawful. Prior to trial the Court excluded

3. The Court notes that there were substantial factual disputes at trial concerning the significance of these events that purportedly increased MerCruiser's market share.

two instances of alleged unlawful conduct: that Brunswick caused Yamaha to exit the stern drive engine market and that Brunswick disseminated boat manufacturers' confidential information. Brunswick argues that Dr. Hall's damage opinion did not change following these rulings, so his damage opinion at trial necessarily incorporates lawful conduct.

With respect to this issue, Brunswick might have had a viable argument had it chosen to raise it. As it turned out, Brunswick did not ask a single question of Dr. Hall about the excluded incidents, and Plaintiffs were prevented by the Court's orders from raising them. Brunswick did not ask Dr. Hall whether his opinion should have changed because of the exclusion of the conduct from consideration. At oral argument on the instant motion, Plaintiffs' counsel did offer an opinion as to what Dr. Hall would have said had he been asked that question, but the Court believes that it would not be appropriate to speculate as to what Dr. Hall's testimony might have been. If Brunswick wanted to demonstrate this particular flaw in Dr. Hall's damage opinion, then it should have inquired about the issue on cross-examination. Because Brunswick did not do so, this issue is moot.[4]

**IV.**

At trial, Plaintiffs challenged three separate types of pricing programs used by Brunswick in the distribution of its stern drive engines: (1) market share discounts; (2) volume discounts; and (3) long-term discounts and contracts.

Prior to the beginning of each new model year, MerCruiser provides boat manufacturers (OEMs) with the upcoming model year's MerCruiser OEM Purchase Agreement (the "agreements"). These agreements provide the terms and conditions under which OEM's may purchase MerCruiser engines, including the discount schedules available on Mer-

Cruiser purchases. In any given year, several types of discounts may be available to OEMs. For example, in one year MerCruiser may offer market share, volume, purchase planning, cash, freight and long term discounts. Combined these discounts can reach approximately 15% off the list price.

Although they have recently been discontinued, MerCruiser provided various market share discounts from 1984 to 1997. The market share discounts allowed boat manufacturers and dealers to earn discounts if they purchased certain percentages of their total engine purchases from MerCruiser. The discounts were usually highest at an 80% market share although in later years the threshold was lowered to 70%. For example, the 1995 through 1997 model year program provided a 1% discount for a 60% share, a 2% discount for a 65% share, and a 3% discount for a 70% share. Tr. at 2474–75.

The volume discounts did not contain a market share component. The volume discounts were based upon the total volume of engines purchased in a given model year. In the 1995–1997 program the volume discounts ranged from 1% to 5% off list price depending on the volume purchased. In 1990, the threshold level for the volume discounts was 15,000 units. By the 1995–1997 model year program, the volume discount threshold had been reduced by 83% to 2,500 units.[5]

The long term discounts did contain market share provisions. Under the long term discounts OEMs would get an additional 1% to 2% discount if they would agree to purchase a certain market share (i.e., 80%) for a term of three years. Brunswick also entered into specific long term contracts with four boat manufacturers: Baja, Porter, Pro–Line and Fountain. These contracts were three to five years in duration and, in the case of Baja and Porter, contained some provisions extending beyond five years. Baja and Fountain's contracts obligated those compa-

---

4. Even if Brunswick had appropriately raised these issues with respect to Dr. Hall's damage opinion, it is unlikely that Dr. Hall's decision to use the same damage figure would be any cause for concern. Plaintiffs challenged a variety of unlawful conduct, some instances of which, understandably, were more serious than others. The two incidents at issue here were minor in

comparison to the other conduct, and it highly unlikely that they would have impacted the damage calculation in any meaningful way.

5. At trial, Plaintiffs presented evidence that these drastic reductions were part of an anticompetitive scheme to break up large buying groups such as IBBI.

nies to purchase 100% of their engines from Brunswick, while Porter was obligated to purchase 99%. Pro-line's contract contained a 50% market share threshold.

Although they were nominally termed "purchase agreements," none of the agreements embodying these discount programs expressly obligated the manufacturers or dealers to purchase engines. Rather, they provided that the OEMs and dealers would receive the discounts if their purchases reached the stated levels. Additionally, none of the agreements contained express provisions restricting the OEMs' or dealers' ability to deal with other engine suppliers.

Brunswick has advanced two closely related arguments in support of the discount pricing programs. First, Brunswick argues that prices under the discount programs were above cost, and are therefore legal *per se*. Second, Brunswick argues that the market share and other discount pricing programs cannot be found to be unlawfully exclusionary.[6]

### A.

In support of its first argument, Brunswick relies heavily on the First Circuit case, *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227 (1st Cir.1983). In *Barry Wright*, Grinnell's codefendant, Pacific, offered Grinnell deep discounts on mechanical "snubbers," shock absorbers used in nuclear power plants. Barry Wright, a competitor of Pacific, alleged that the discounts were anticompetitive because they were unreasonably low and were intended to drive Barry Wright out of business. On appeal, the First Circuit examined the existing case law to determine when a price cut should be viewed as "predatory" and condemned by the antitrust laws. The court rejected a number of approaches from other circuits and ruled that prices above incremental and average costs are *per se* lawful. The court also found that the contract was not unreasonably exclusionary even though it required Grinnell to purchase the majority of its expected requirements (approximately 86%) from Pacific.

Brunswick further cites *Henry v. Chloride*, 809 F.2d 1334 (8th Cir.1987), another predatory pricing case, wherein the Eighth Circuit cited *Barry Wright* for the proposition that "prices above average total cost are legal *per se*." *Id.* at 1346. Because there has never been an allegation of below cost pricing in the present case, Brunswick argues that Plaintiffs' claims with respect to the various discount programs are foreclosed.

The Court questions whether this principle from *Barry Wright* and *Henry* completely forecloses Plaintiffs' claims. Plaintiffs have never alleged predatory pricing by Brunswick, and the Court agrees with Plaintiffs that this case has never been about "low prices." To the contrary, Plaintiffs have alleged and attempted to prove that Brunswick charges anticompetitive *high* prices for its engines. Plaintiffs are seeking to recover an overcharge based upon those prices. In essence, Plaintiffs have maintained that Brunswick sets an anticompetitive high price for its engines and then offers an attractive discount schedule designed to lock customers in to Brunswick purchases. Although one could attempt to argue that the discounts are merely functions of price, these discounts are not *solely* functions of price because they are tied to corresponding conditions based upon certain degrees of exclusivity.

Furthermore, at least one court has rejected the argument that *any* pricing practice that leads to above cost prices is *per se* lawful under the antitrust laws. *See LePage's Inc. v. 3M*, No. Civ.A. 97–3983, 1997 WL 734005 (E.D.Pa. Nov.14, 1997). In that case, the restraint at issue was product "bundling," where the defendant, 3M, offered discounts on several products purchased together, but the prices were not below cost. In a motion to dismiss, 3M cited the Supreme Court's decision in *Brooke Group v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), (as does Brunswick) in support of the position that above cost prices are legal *per se*. *Id.* at *8–9. However, in an earlier case, *SmithKline v. Eli Lilly & Co.*, 575 F.2d 1056 (3rd Cir. 1978), the Third Circuit had found that a similar "bundling" program violated Section 2. The district court in *LePage's* rejected 3M's argument, ruling that the conduct at issue was similar enough to that found un-

---

**6.** Brunswick did not raise either of these arguments prior to trial.

lawful in *SmithKline* to overcome the motion to dismiss. *Id.* at *9–10. In the face of the obvious distinction that *Brooke Group* was a predatory pricing and price discrimination case, the court stated that it "could not conclude that *Brooke Group* supersedes *SmithKline* with respect to this case." *Id.* at *9.

Similarly, the district court in *SmithKline* specifically rejected a "safe harbor" argument somewhat identical to Brunswick's argument here. *SmithKline Corp. v. Eli Lilly & Co.,* 427 F.Supp. 1089 (E.D.Pa.1976). The district court's rationale is entirely applicable to the instant case, in spite of the slightly different factual context:

> [A] monopolist does not receive immunity merely because it has priced the product in issue above its average cost. For that immunity is lost when it uses a pricing scheme linking the monopolistic products (Keflin and Keflex) with another competitive product (Kefzol) to deter SmithKline from entering or effectively competing in the cephalosporin market. We should be ever mindful that the gravamen of this complaint and my holding are not that the *price* Lilly separately charges for Keflin or Keflex are unreasonable from an antitrust standpoint; the nub of this case is the *linkage of these latter products in a pricing scheme to deter competition in Kefzol. . . .*

*SmithKline,* 427 F.Supp. at 1128 (emphasis added). Thus, the district court recognized that it was not the price that was relevant, it was the "strings" attached to the price.[7] In the instant case, Plaintiffs are not challenging unreasonably low prices. They are challenging the "strings" attached to Brunswick's prices, i.e., the exclusivity provisions.

Notably, *SmithKline* and *LePage's* are not the only "bundling" cases which lend support to Plaintiffs' position here. In *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc.,* 920 F.Supp. 455 (S.D.N.Y.1996), the court undertook an extensive analysis of the above average variable cost issue with respect to "bundling" and stated:

> This analysis disposes of Abbott's contention that it is entitled to dismissal of the Section 2 claims because it is not even accused of pricing below average variable cost. While average variable cost is the controlling standard in this circuit in single product cases, ... *Brooke Group* did not even address package pricing such as that involved here and thus cannot have decided the issue. For present purposes the controlling standard *serves only one purpose*—distinguishing in single product situations (a) *pricing* that constitutes competition on the merits from (b) *pricing* that may permit a monopolist or putative monopolist to get rid of its competitors and pave the way for an abuse of market power.

*Id.* at 467–68 (emphasis added)(footnote omitted). This quote lends support to Plaintiffs' position that the various incarnations of the "above cost" rule apply only to the price itself.

The Court believes that the proper application of *Brooke Group, Barry Wright,* and *Henry* to this case is that the "above cost" rule applies only to the price itself, and that those cases do not *per se* validate all above cost pricing programs which may be combined with additional restraints or otherwise structured in an anticompetitive manner.

## B.

■ Brunswick next argues that its various market share discount programs can not, as a matter of law, constitute unlawful conduct in violation of Section 1 or 2 of the Sherman Act.

As described above, the market share discount programs required the boat manufac-

---

7. The Third Circuit affirmed the district court in *SmithKline.* The court's ruling is instructive: "In sum, the act of willful acquisition and maintenance of monopoly power was brought about by linking products on which Lilly faced no competition Keflin and Keflex with a competitive product, Kefzol. The result was to sell all three products on a non-competitive basis in what would have otherwise been a competitive market for Ancef and Kefzol.... Were it not for the Lilly's [pricing plan], the price, supply, and demand of Kefzol and Ancef would have been determined by the economic laws of a competitive market. The Revised CSP blatantly revised those economic laws and made Lilly a transgressor under § 2 of the Sherman Act." *SmithKline v. Eli Lilly & Co.,* 575 F.2d 1056, 1065 (3rd Cir.1978).

turers and dealers participating in the programs to purchase certain levels of their total engine requirements (usually 70%—80%, and in the case of some dealer programs, 100%) in order to receive certain discounts. Plaintiffs uniformly testified that purchasing MerCruiser engines and fulfilling the market share requirements was their only viable economic option and that in order to remain in business they had to achieve the maximum discounts. At trial, Plaintiffs presented evidence that the market share programs excluded Brunswick's competitors from the relevant market which in turn allowed Brunswick to artificially inflate engine prices. In addition, Plaintiffs introduced substantial evidence demonstrating Brunswick's monopoly power. With a market share of approximately 75%—80%, the evidence reflected that Brunswick dominates the relevant market.

Plaintiffs' expert, Dr. Hall, testified that the various programs and contracts operated to tax boat manufacturers and dealers on their purchases of non-Brunswick engines. Dr. Hall described the operation of the programs and their resulting tax as follows:

> First of all, we should understand the economics of the transaction that occurs between Brunswick and a boatmaker. Both of them desire to buy and sell the engine, so that's part of the story, so part of what you see there is boatmaker purchases of engines from Brunswick. But something else is happening in these contracts that's very important to understand, and that is that Brunswick is buying from the purchaser a barrier to entry. It does that by putting provisions into the contract, the market share, quantity discount, those type of provisions that we'll talk about. In order to sustain that, Brunswick has to, basically, buy that from the boatmaker. That's part of the deal.
>
> \*    \*    \*    \*    \*    \*
>
> The effect of these provisions is to give a substantial discount to a company that gives Brunswick a large fraction of its business. That's why they're called market share contracts. The market share being measured here is not the market as a whole, it's the share of that boatmaker's engine purchases that ... is directed to Brunswick. The discounts are largest if a high share of the purchases come from Brunswick, and typically disappears below some level here (indicating), 60 percent. So, to start with the market share provision of the contract, it gives a 3 percent discount if more than 70 percent of engine purchases come from Brunswick; 2 percent between 65 and 69; 1 percent between 60 and 64; and below 60, no. discount. The discount is taken away. Now, I'll go over this several times. But the tax comes in the following way: If a boatmaker decides to take some of its engine business elsewhere so that ... for example, it drops below 70 percent, but it continues to purchase some engines, say 65 percent of its engines from Brunswick, it loses discount on the remaining engines. So you're losing something; business that's staying with Brunswick is no longer as well priced, its price is going up. That means, in effect, it's costly to buy those engines. You're sacrificing discounts by buying engines from another supplier. You lose the discount on the remaining engines. So as—if a company went several notches down here (indicating), it could lose all three percentage points and, yet, if it continued to buy engines, it would have to be paying a higher price for the Brunswick engines. So there's a tax, as a company, in this case, as a boatbuilder, that goes from the 70 percent level below the 60 percent level. As they make that transition from being more loyal to Brunswick to less loyal, they're paying a tax on the engines that they're still buying.

Tr. 1158–61.

Plaintiffs presented further evidence regarding the effects of these discount programs. Dr. Hall testified that in 1996, 38% of all stern drives and inboards were sold under the market share discount programs. Similarly, the evidence reflected that Brunswick's captive boat companies, Bayliner and Sea Ray, accounted for 40% of the stern drive and inboard sales in 1996. Thus, the foreclosure rate at the manufacturer level was estimated to be 78%. In addition, at the dealer level, approximately 25% of the total industry's stern drive and inboard shipments in 1996 were tied to the dealer market share agreements. Evidence was also introduced

that Brunswick's current principal competitor, Volvo, has been unable to achieve minimum efficient scale because of the alleged unlawful programs and acquisitions.

Finally, Plaintiffs presented a substantial amount of evidence regarding the "two-tiered" effect of the discount programs. In the marine industry boat manufacturers must have a network of dealers willing to carry their boat lines. Because Brunswick utilized the discount programs at the boat manufacturer *and* dealer level, several boat manufacturers testified that even if they had wanted to support Volvo, they could not have switched because the incentivized dealers would refuse to purchase non-MerCruiser powered boat lines. In contrast to the 70% to 80% manufacturer programs, several of the dealer programs from 1992 to 1996 required that the dealer sell 100% MerCruiser engines.

Although Brunswick was acutely aware of the effects of the various programs, the industry's concerns apparently fell on deaf ears. Plaintiffs, along with other boat manufacturers, complained vehemently to Brunswick that the market share requirements were unfair, and that they effectively prevented boat manufacturers from supporting other engine manufacturers. In spite of this, Brunswick never withdrew the market share requirements and even sought to increase the market share requirement to 95% in the proposed 1994 "Industry Growth Program." Those efforts ultimately proved unsuccessful due to serious backlash from boat manufacturers. Notably, MerCruiser's Director of Marketing, Bob Gowens, wrote that the purpose of the initial version of the Industry Growth program was to put MerCruiser's customers in "golden handcuffs" and to "lock out" Volvo. *See* PX 239, 1323.

Brunswick's business documents are riddled with acknowledgments of the anticompetitive nature of these agreements. In one document, MerCruiser employee Mike Gyorog wrote that "MerCruiser's market share is being driven by OEM's pricing to dealers to achieve 80 percent market share commitment." PX1369A. The reasonable inference from such a statement is that boat manufacturers were disadvantageously pricing non-MerCruiser equipped boats in order to achieve the market share requirements, and

that this practice was "driving" MerCruiser's near–80% market share. Similarly, Barry Eller, MerCruiser's General Manager, acknowledged that the market share programs insulated MerCruiser from market share erosion:

> MerCruiser will incur the risk of market share loss as a result of eliminating the market-share related discounts form the OEM program. Falling below 70% market share today has significant implications.... The minimum penalty for falling below 70% market share is 3.2%, and as much as 7%. The current program does have an impact on our business ....

PX 1510A (emphasis added). Additionally, in 1990, McKinsey & Company and Mercury Marine jointly produced a document titled "Final Progress Review." According to that document, "Marine Power [i.e. Mercury Marine] has *meaningful barriers to entry* at sterndrive boat builders based upon volume rebates, share pricing, and long-term contract commitments." PX 1128A (emphasis added). Numerous other Brunswick documents reflect the anticompetitive intent and effect of the various programs.

Brunswick seeks to avoid the substantial evidence described above on formalistic legal presumptions. According to Brunswick: (1) Plaintiffs' claims are appropriately described as exclusive dealing claims; (2) under exclusive dealing law, a contract may be found unlawful *only* if it *completely* prevents customers from dealing in the goods of a competitor (in other words, only if it is 100% exclusive); and (3) because the boat manufacturers and dealers in this case retained the ability to deal with Brunswick's competitors, then the agreements at issue cannot constitute exclusive dealing and cannot violate the Sherman Act. Brunswick further argues that even if the agreements can constitute exclusive dealing, they are non-binding, and thus their short "duration" mandates a finding that they are lawful.

Brunswick's arguments are incorrect as a matter of law and fact. After a ten-week jury trial, the record is replete with evidence that Brunswick's programs, in conjunction with the remainder of the allegedly anticompetitive conduct, effectively *required* Plain-

tiffs and other boat manufacturers to purchase *extremely* high percentages of their total engine purchases from Brunswick for terms as long as three to five years, and that the manufacturers in fact risked their economic survival by dealing with alternative suppliers. The record also reflects the anticompetitive effects of these agreements, specifically that they prevented MerCruiser's competitors from competing in the relevant market and allowed MerCruiser to artificially elevate engine prices in the relevant market. The fact that the contracts are "non-exclusive" on their face and allow *some* purchases from other suppliers is technically irrelevant, as the fundamental consideration is the objective reasonableness and overall economic effect of *the entirety* of Brunswick's conduct, including the agreements at issue. Although Plaintiffs ostensibly retained the ability to deal with Brunswick's competitors, the overwhelming evidence was that this ability was tremendously restrained by the agreements, and that this restraint produced anticompetitive effects. In the Court's opinion, these agreements cannot be upheld *as a matter of law* merely because they were not 100% exclusive.[8]

The Court has found no·existing case law addressing anything even close to the unique situation presented in this case. That is: (1) a defendant with monopoly power; (2) competing at two levels of distribution; (3) effectively requiring its downstream customers *at separate levels of distribution* (i.e., OEM's *and* dealers) to purchase extremely high percentages (70%–100%) of their requirements from the defendant; (4) in order to receive discounts, the receipt of which are the buyers' only viable economic option; and (5) resulting in the obvious exclusion of any significant competition in the relevant market, the artificial inflation of prices in that market, and the assessment of unreasonable taxes and penalties on non-complying buyers. The Court has no doubt that such practices are within the purview of the Sherman Act, regardless of their alleged non-exclusivity be-

cause they are the de facto equivalent of exclusive dealing.

The Supreme Court has specifically stated that antitrust cases must be resolved on their own unique facts:

> Legal presumptions that rest on formalistic distinctions· rather than actual market realities are generally disfavored in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the "particular facts disclosed by the record."

*Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 466–67, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992), *citing Maple Flooring Manufacturers Ass'n v. United States,* 268 U.S. 563, 579, 45 S.Ct. 578, 69 L.Ed. 1093 (1925). Similarly, the Eighth Circuit has expressly found that conduct that does not meet the "traditional" requirements for a particular antitrust claim can still violate the Sherman Act if it shares the same anticompetitive effect. In *Terre Du Lac Association, Inc. v. Terre Du Lac, Inc.,* 772 F.2d 467 (8th Cir.1985), the court refused to dismiss a claim for unlawful tying, even though the conduct at issue clearly did not constitute a tying arrangement. In doing so the court stated:

> [T]he evil which is allegedly generated by the defendants' initiation fee arrangement is the same as that generated by traditional unlawful tying arrangements—competition in the market for one product is restrained due to the seller's exploitation of its control over another product.... Thus, even though a proper tying claim was not alleged in the Association's complaint, the factual allegations made in the complaint may support a conclusion that the defendants' initiation fee arrangement constitutes an unreasonable "restraint of trade," 15 U.S.C. § 1, in violation of the antitrust laws, *with the Association's tying arrangement serving only as an analogy for analyzing the lawfulness of the defendants' initiation fee arrangement.*

---

8. Plaintiffs raise a good point with respect to the 100% argument. At what point would courts draw the line if that was in fact the law? Could 99% contracts violate the Sherman Act? Apparently under Brunswick's theory they could not, regardless of the anticompetitive impact such contracts might have. Such a drastic example reinforces the notion that it is the manifest reasonableness and effect of a challenged restraint, not its conclusory label, that is relevant to a Sherman Act rule of reason analysis.

*Id.* at 474–75 (emphasis added). Thus, regardless of whether the conduct at issue fits perfectly within a previously determined category of unlawful conduct, the fundamental concern is whether the conduct, in light of its requisite effects, can reasonably be found to violate Sections 1 and 2 of the Sherman Act.

To prevail under Section 1 of the Sherman Act, Plaintiffs were required to prove the presence of agreements which unreasonably restrained trade. *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988). Under Section 2 of the Sherman Act, Plaintiffs were required to demonstrate that Brunswick's pricing programs constituted exclusionary conduct in furtherance of a scheme to willfully acquire or maintain its monopoly power. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). Plaintiffs have presented a tremendous amount of proof on these elements, and the jury obviously found that Plaintiffs had satisfied their burdens. The Court has not found any rule of law that would mandate a reversal of those findings. Accordingly, Brunswick's motion for judgment as a matter of law with respect to the market share discount programs is denied.

## V.

[5] Brunswick next argues that Dr. Hall's methodology used to support Plaintiffs' liability claims and to calculate their damages fails to meet the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and FED. R. EVID. 702. Brunswick further argues that Dr. Hall's testimony cannot provide a "legally sufficient evidentiary basis" necessary to survive a motion for judgment as a matter of law.

Prior to trial the Court denied Brunswick's *Daubert*-related motion, and the Court will do so again here. The Supreme Court could not have stressed more forcefully in *Daubert* that the focus of Rule 702 is solely on technique and methodology, not the conclusions that they generate. *Daubert*, 509 U.S. at 595, 113 S.Ct. 2786. Plaintiffs have amply demonstrated the soundness of the Cournot model as a fundamental, time-tested economic tool that has been widely accepted for years by reputable economists. Indeed, the Cournot model provides the theoretical underpinnings for the Department of Justice's Horizontal Merger Guidelines and the widely used Herfindahl–Hirschman Index (the "HHI"). Noted economist Dr. Carl Shapiro has described the Cournot model as follows:

> Another attractive feature of the Cournot equilibrium is that it allows us to draw some direct relationships between market structure and performance ... Thus, Cournot's theory provides an intuitively reasonable prediction of the relationship between equilibrium market structure (as measured by market shares), and performances... Amazingly, this relationship can be summarized using a simple concentration index, the Herfindahl Index, in conjunction with the elasticity of industry demand.

DR. CARL SHAPIRO, HANDBOOK OF INDUSTRIAL ORGANIZATION 342 (1984). Brunswick makes no attempt to argue that the Cournot model is an inappropriate method of predicting equilibrium price formation in oligopolistic markets. And once one accepts the proposition that the Cournot model can be used to predict competitive price formation, each of Brunswick's criticisms are reduced to complaints about how Dr. Hall applied the Cournot model to the facts of this case. Accordingly, the Court finds that neither *Daubert* nor the Federal Rules of Evidence render Dr. Hall's opinions inadmissible.

But even if *Daubert* and Rule 702 did apply to these *factual* criticisms of Dr. Hall's opinions, those opinions would still be entirely admissible. Brunswick more or less attacks every opinion Dr. Hall rendered in this case, arguing that Dr. Hall's 50/50 opinion is legally impermissible, and that every other opinion flowing from the 50/50 assumption is therefore fundamentally flawed. According to Brunswick, the 50/50 theory is "repugnant to the procompetitive purposes of the antitrust laws."

In its memorandum, Brunswick seems to argue that Dr. Hall has opined that every competitive market results in a 50/50 division. In fact, many of Brunswick's criticisms are in the same vein: Brunswick attempts to paint Dr. Hall's conclusions as absolutes *in*

*every market.* But Dr. Hall could not have testified more clearly that his opinions in this case are based on a specific analysis of *this* market and the *specific* conduct that has been occurring in *this* market. Dr. Hall also clearly testified that the 50/50 conclusion was not mathematically precise. He further described how the hypothetical market could have been even more competitive, resulting in even lower equilibrium prices.

Beyond that, it is hard for the Court to see what is so "repugnant" about the 50/50 conclusion. If Dr. Hall had altogether eliminated Brunswick from the hypothetical market, there would be serious cause for concern. But Dr. Hall chose a hypothetical market division that is, with all things considered, relatively conservative and based upon actual facts in the record. Brunswick's protestations to the contrary are unfounded and, not surprisingly, implicate factual disputes that were for the jury to decide.

Brunswick's arguments with respect to the remainder of Dr. Hall's opinions suffer from the same infirmities as described above. In each instance Brunswick argues that an opinion is "completely unfounded" or "speculative" or "bogus," even though every one of the opinions was carefully explained by Dr. Hall, was reasonable under the circumstances, and has abundant support in the factual record. Furthermore, as explained in Section III., *supra,* Dr. Hall's opinions did in fact take into account the events which purportedly increased Brunswick's market share.

In sum, the Court finds no defects in Dr. Hall's methodology or the application of his methodology to the facts of this case, and his expert testimony is plainly sufficient to support the jury's verdicts.

## VI.

■ Brunswick next asserts that it is entitled to judgment as a matter of law on the present value calculation incorporated into Dr. Hall's damage analysis. First, Brunswick argues that such a recovery is precluded because present value and prejudgment interest are synonymous under the law. Second, Brunswick argues that Dr. Hall's present value calculation is in actuality a prejudgment interest calculation and should therefore be precluded.

It is well settled that prejudgment interest is not recoverable in an antitrust case. *See Fishman v. Estate of Wirtz,* 807 F.2d 520, 561–62 (7th Cir.1986). However, several courts have upheld awards compensating for the present value of the injury, and the Eighth Circuit expressly allows for present value calculations in antitrust cases. *See H.J. Inc. v. International Tel. and Tel. Corp.,* 867 F.2d 1531, 1549 (8th Cir.1989). In *H.J.,* the court ruled that the appropriate measure of damages "is the present value of profits lost" as a result of the unlawful conduct. *Id.; see also Multiflex Inc. v. Samuel Moore,* 709 F.2d 980 (5th Cir.1983)(recovery allowed for damages that included "what the asserted lost profits would have earned in an open investment market," given that the claim was "based on an economic theory and not on a claim to statutory or common law prejudgment interest."); *Lovett v. General Motors Corp.,* 769 F.Supp. 1506, 1521–22 (D.Minn.1991)(allowing a present value calculation), *rev'd on other grounds,* 998 F.2d 575 (8th Cir.1993).

Brunswick argues that present value calculations are not recoverable because they are identical in function to prejudgment interest. Brunswick cites a non-antitrust case, *Library of Congress v. Shaw,* 478 U.S. 310, 321, 106 S.Ct. 2957, 92 L.Ed.2d 250 (1986) where the Supreme Court ruled that a plaintiff in a suit against the government may not recover for prejudgment interest absent "an express waiver of sovereign immunity from an award of interest." *Id.* at 311, 106 S.Ct. 2957. The Court in *Library of Congress* rejected the plaintiffs' argument that the no-interest rule did not preclude an award for delay in recovery. The Court stated that "[i]nterest and a delay factor share an identical function. They are designed to compensate for the belated receipt of money. . . ." *Id.* at 322, 106 S.Ct. 2957. Brunswick cites several unpublished cases that have applied *Library of Congress* in the antitrust context and precluded present value damage calculations.

The Court finds that *Library of Congress* does not preclude a present value damages calculation in this context. Plaintiffs are not making any type of claim to statutory or common law prejudgment interest. Rather,

they are seeking to recover the present value of the overcharge. Given that *H.J.* (which was decided three years after *Library of Congress*) and other persuasive authority specifically allow for such a recovery, the Court finds that such an award would be appropriate.

The Court must still resolve the issue as to whether Dr. Hall's present value calculation is in effect a prejudgment interest calculation that would be precluded. Brunswick points to Dr. Hall's initial expert report where he stated: "Plaintiffs are entitled to interest on these damages from the time the damages were incurred until the time of trial. I calculated this interest as the cost of debt that Brunswick faces." Prelim. Rep. of Dr. Robert Hall at 46. Brunswick moved *in limine* to preclude this portion of Dr. Hall's damage calculation, and Plaintiffs argued in response that although Dr. Hall called the calculation "interest" in his report, he actually was describing a calculation for present value. Because it was unclear at the time how Dr. Hall made his calculation, the Court reserved ruling on that portion of the motion, finding that the true nature of the calculation would have to be determined from his trial testimony.

Dr. Hall's testimony at trial demonstrated that his calculation was actually one for present value. The following exchange occurred between Plaintiffs' counsel and Dr. Hall:

A. Now, there is one more thing that needs to be done in the measurement of what this means in terms of how—what amount of compensation today would be necessary to make up for overcharges that occurred in the past. Because to make up today for a loss that occurred in the past—loss being the overcharge here—you have to adjust for the time value of money and we do that through the discount rate.

(Objection)

Q. Dr. Hall, if you will continue with your answer, which I think was directed at how you went about calculating the time value of damages, time value of that money.

A. Certainly. Another word for the adjustment that I'm applying here is what economists call present value. This 202, say, for 1986 says that it takes $2.02 to compensate someone today for a dollar

that they lost in 1986. Or what we would say is the present value today of a 1986 dollar is $2.02. That's how we adjust for the fact of timing matters. If we look into the future, as we will, it goes the other way. The amount of compensation today for a future dollar lost is less than a dollar because you would rather have the dollar now than later. That's the time value of money expressed as the present value. So the overcharge in 1986 of $925,000.00 then to bring to present value is multiplied by 2.02 and that gives the $1.8 million for 1986. Similarly, all the way across. The same calculation for each year through 1993.

Brunswick's expert, Dr. Richard Rapp, challenged Dr. Hall's description of the calculations as present value calculations. Tr. at 5365–67. However, Dr. Rapp's testimony did not persuade the Court that Dr. Hall's calculations were bare interest calculations. Accordingly, the Court finds that Dr. Hall appropriately adjusted his damage calculations to reflect the present value of the overcharges. Brunswick's motion for judgment as a matter of law with respect to this issue is denied.

## VII.

Brunswick next argues that two Plaintiffs did not prove at trial that they acquired their claims from their corporate predecessors. Plaintiffs filed this lawsuit on December 7, 1995. In 1991 Mirage Marine transferred some of its assets to Mirage Holdings. In 1996, following the commencement of the lawsuit, Mirage Holdings transferred its assets to the named Plaintiff in this action, Mirage Manufacturing, LLC. Similarly, in 1993 WTYS No. 4 acquired the assets of Thompson Boat Company out of bankruptcy. Then in 1996, WTYS No. 4 sold its assets to the current Plaintiff, Thompson Marine Products.

Brunswick argues that Mirage and Thompson cannot recover on any of their claims because the did not prove at trial that they "own" their claims. Brunswick characterizes the argument as follows:

Plaintiffs Mirage Manufacturing, LLC ("Mirage") and Thompson Marine Products, Inc. ("Thompson") offered no *evidence* that they acquired a cause of action from their predecessors. Neither is entitled to recover damages for claims that they failed to demonstrate that they *own*. And, at trial, they did not demonstrate anything at all about the subject. Simply put, this is a failure of proof.

Brunswick's Mem. dated June 15, 1998 at 32 (emphasis in original); *see also,* Brunswick's Mem. dated May 13, 1998 at 115–16 ("But neither offered any proof to the jury that it acquired its predecessor's cause of action against Brunswick.... As a matter of law, Brunswick is entitled to judgment on those damage claims.").

This argument is somewhat puzzling, because there is no substantive or procedural requirement that a party must take the stand and testify that it "owns" the claims it is pursuing. In fact, such a notion is plainly contradicted by the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 17(a) and 25(c). Apparently equally confused, Plaintiffs initially responded to the argument as if Brunswick had asserted a lack of standing defense. However, an argument of this nature has nothing to do with standing. Instead, the issue falls squarely within the "real party in interest" doctrine, a concept directly addressed by Rule 17 of the Federal Rules of Civil Procedure. *See Tate v. Snap–On Tools Corp.,* No. 90 C 4436, 1997 WL 106275 (N.D.Ill. Feb.11, 1997)(distinguishing standing from the real party in interest doctrine); *see also* 6A WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, § 1542 (2d ed.1990). Accordingly, the Court will construe Brunswick's "failure of proof" argument as a real party in interest objection under Rule 17.

Federal Rule of Civil Procedure 17(a) specifies that an action "shall be prosecuted in the name of the real party in interest." In other words, the action must be brought by the person entitled under the governing substantive law to enforce the asserted right. The purpose of the rule is to prevent multiple or conflicting lawsuits by persons such as assignees, executors, or third-party beneficiaries, who would not be bound by *res judicata* principles. 6A WRIGHT, MILLER & KANE, FED-

ERAL PRACTICE AND PROCEDURE, § 1543 (2d ed.1986). But Rule 17 specifically requires that before an action can be dismissed at a defendant's behest, the court must allow a reasonable time for ratification by, or joinder of, the real party in interest. Thus, the Eighth Circuit Court of Appeals has consistently held that Rule 17 objections must be timely raised:

> Because the requirements in Rule 17(a) are for the benefit of the Defendant, we have held that an objection on real party in interest grounds "should be raised with reasonable promptness in the trial court proceedings. If not raised in a timely fashion, the general rule is that the objection is deemed waived."

*United HealthCare Corp. v. American Trade Ins. Co.,* 88 F.3d 563, 569 (8th Cir.1996)(*quoting Sun Refining & Marketing Co. v. Goldstein Oil Co.,* 801 F.2d 343, 345 (8th Cir. 1986)). In *United HealthCare,* the court found that an objection raised one week prior to trial was untimely. Other courts have routinely rejected untimely objections as having been waived. *See, e.g., Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.,* 40 F.3d 1416, 1431 (3rd Cir.1994)(buyer of corporation waived right to require successor in interest of seller to be substituted as party plaintiff, by not raising objection until it made a motion for summary judgment at trial); *Gogolin & Stelter v. Karn's Auto Imports Inc.,* 886 F.2d 100, 102–03 (5th Cir.1989)(holding that defendant waived real party in interest defense by "untimely assertion," where defendant raised it for the first time in a motion for directed verdict); *Hefley v. Jones,* 687 F.2d 1383, 1388 (10th Cir.1982)(objection raised sixteen days prior to trial was untimely).

In the present case, Brunswick did not raise its real party in interest objection until it filed its motion for judgment as a matter of law. Under well-settled authority Brunswick raised the issue in an untimely manner, and the issue is waived.

Because some of the transfers at issue here occurred after the commencement of this lawsuit, consideration of Rule 17 does not completely resolve the matter. Rule 17 applies only to transfers prior to the com-

mencement of the lawsuit. *ELCA Enterprises, Inc. v. Sisco Equip. Rental & Sales, Inc.,* 53 F.3d 186 (8th Cir.1995). When a transfer occurs during the pendency of litigation, Rule 25(c) governs. Rule 25(c) states that "in case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." FED. R. CIV. P. 25(c). The rule is "designed to allow an action to continue unabated when an interest in a lawsuit changes hands, rather than requiring the initiation of an entirely new lawsuit." *ELCA Enterprises, Inc.,* 53 F.3d at 191. Whether to substitute or join a transferee under Rule 25(c) is a discretionary determination by the trial court. "The court, if it sees fit, may allow the transferee to be substituted for the transferor. It is also free, if it wishes, to retain the transferor as a party and to order that the transferee be made an additional party." 7C WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE, § 1958 (2d ed.1986).

Here, two transfers of interest occurred during the pendency of the litigation. On April 18, 1996, Plaintiff Thompson Marine Products foreclosed on the assets of WTYS No. 4, Inc. On October 1, 1996, Mirage Holdings Inc. was sold to Plaintiff Mirage Manufacturing, LLC. Plaintiffs filed a motion for leave to file a third amended complaint on March 5, 1997. In the memorandum in support of the motion, Plaintiffs described the two corporate transfers and requested leave to substitute the new corporate entities. Plaintiffs specifically averred that the new corporate entities received the rights to any proceeds received in connection with this lawsuit. On March 17, 1997, Brunswick responded to Plaintiffs' motion to amend, stating that it had no objection to the party modifications proposed by Plaintiffs.

Although Plaintiffs filed their motion to amend pursuant to Rule 15, the import of the motion was clear: Plaintiffs intended to substitute two corporate successors in interest for the then existing Plaintiffs, WTYS No. 4 and Mirage Holdings. Thus, the fact that the motion did not implicate Rule 25(c) on its face is irrelevant. By failing to object to the substitution, Brunswick waived any objection that it may have had. And even if the objection was not waived at the time of the motion, Brunswick was still obligated to raise any "improper substitution" issue in a timely manner to allow the Court to properly address it and to allow Plaintiffs to cure any possible defects. In sum, as with the Rule 17(a) objection, Brunswick has simply waited too long to inject this issue into this litigation. If Brunswick did not believe that Thompson Marine Products and Mirage Marine Manufacturing LLC were proper Plaintiffs, it should have raise the issue at an appropriate time. Similarly, if Brunswick believed that additional parties should have been joined to allow for complete relief, that issue should have been timely raised as well.

The Court believes the foregoing makes it clear that Plaintiffs Mirage and Thompson were not obligated to "prove up" their corporate history as a predicate to recovering on these claims. To the contrary, it was incumbent upon Brunswick, not the Plaintiffs, to raise issues of "ownership" of claims and necessary parties in a timely manner under the Federal Rules of Civil Procedure. Because Brunswick failed to do so, any objections it may have had in that regard are waived.

## VIII.

In its final argument, Brunswick merely repeats the basic thrust of the argument above regarding Mirage and Thompson. Brunswick argues that "with respect to each Plaintiff who failed to appear and testify at trial, the record is devoid of any evidence that these Plaintiffs are in fact the Plaintiffs specified in the Complaint." Brunswick's Supp. Mem. dated May 15, 1998. Of course, as explained above, none of the Plaintiffs were obligated to testify to "identify" themselves or demonstrate that they "own" their claims. This argument is rejected.

Brunswick also argues that for those Plaintiffs who did not testify, there is no evidence in the record that they in fact purchased engines from Brunswick. Brunswick argues that the engine purchase data introduced through Dr. Hall is insufficient to establish this point.

This argument in simply incorrect. The engine purchase information introduced through Dr. Hall was based upon data supplied by Brunswick. As such, it was competent evidence regarding engine purchases that the jury was entitled to consider. Furthermore, it is significant that Brunswick never contested that the engine purchases were made by the Plaintiffs. In fact, in Brunswick's Answer to Plaintiffs' Fourth Amended Complaint, Brunswick admitted that each Plaintiff purchases stern drive engines from Brunswick. Brunswick never even objected to the introduction of exhibits through Dr. Hall attempting to establish the engine purchase information. In sum, there is substantial evidence in the record regarding all of the Plaintiffs' engine purchases, and the Plaintiffs were not obligated to individually appear and offer that testimony.

### IX.

In its motion, Brunswick has raised several additional grounds for judgment as a matter of law. The Court has carefully considered these remaining issues and finds that they are uniformly lacking in merit. Several of these arguments clearly raise questions of fact that are not properly considered in a motion for judgment as a matter of law. Others ask the Court to completely disregard established authority as well as the voluminous evidence produced by the Plaintiffs in this case. The Court will summarily address these issues.

First, Plaintiffs presented substantial evidence to support the jury's verdict defining the relevant product market as the market for the sale of stern drive and inboard marine engines. Second, the jury's implicit finding that Brunswick possessed monopoly power in the relevant market is supported by substantial evidence and applicable authority. Third, the statute of limitations clearly does not act as a bar to Plaintiffs' claims under Section 7 of the Clayton Act. Fourth, Plaintiffs unquestionably have standing to recover damages based on Brunswick's anticompetitive acquisitions. And finally, the jury's finding that Brunswick's multiple acquisitions, considered collectively, violated Section 7 of the Clayton Act is fully supported by the evidence and applicable authority.

### X.

Brunswick has also filed a motion for a new trial raising many of the same issues in its motion for judgment as a matter of law. The Court may grant a new trial on the basis that the verdict is against the weight of the evidence, if failing to do so would result in a miscarriage of justice. *Shaffer v. Wilkes,* 65 F.3d 115, 117 (8th Cir.1995) (*quoting White v. Pence,* 961 F.2d 776, 780 (8th Cir.1992)). "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict'." *White,* 961 F.2d at 780 (*quoting Ryan v. McDonough Power Equip.,* 734 F.2d 385, 387 (8th Cir.1984)). The Court, however, may not "reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *White,* 961 F.2d at 780 (quotations omitted).

The discussions in sections III, IV, V, and IX, *supra,* are particularly relevant to the initial issues raised in Brunswick's motion, and the Court will not repeat those discussions here. The Court finds that the jury's verdicts with respect to Plaintiffs' claims under Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act are not against the great weight of the evidence, and do not constitute a miscarriage of justice.

Brunswick argues that it is entitled to a new trial because the damages awarded by the jury were grossly excessive. However, the bulk of Brunswick's argument is directed to the same criticisms of Dr. Hall's opinions that the Court has rejected above. Brunswick also argues that if it had charged Dr. Hall's competitive price for engines, then it would have lost money on the sale of those engines. However, Dr. Hall offered a reasonable explanation for why that was an incorrect argument, and the jury was well within its province to reject the testimony of Dr. Rapp.

Brunswick also argues that it is entitled to a new trial based upon several evidentiary rulings. The Court finds that the admission

of Dr. Hall's testimony, including the testimony regarding the present value of Plaintiffs' damages, was in no way unfairly prejudicial and does not provide a basis for a new trial. Furthermore, as explained in Sections VII and VIII, *supra*, all of the Plaintiffs presented competent, substantive evidence to demonstrate the elements of their claims, and they were in no way obligated to individually appear to testify that they "owned" their claims or to offer testimony regarding engine purchases.

The McKinsey documents were admitted by the Court after thorough consideration of the arguments and authority cited in Plaintiffs' Memorandum in Opposition to Defendant Brunswick Corporation's Motion in Limine (McKinsey & Company Documents) dated March 16, 1998. The McKinsey documents were relevant and admissible under multiple grounds, and Brunswick suffered no unfair prejudice from their admission.

The Court finds no error in the admission of the FTC Stipulation, which was appropriately admitted under 801(d)(2) and was not unfairly prejudicial. Brunswick's arguments as to the irrelevance of the FTC Stipulation are completely contradicted by the trial testimony of former Brunswick CEO Jack Reichert, who testified that there was actually *more* competition between outboards and stern drives in 1976. Tr. 4727–29. Furthermore, even if the FTC stipulation was improperly admitted (which it was not), it could only constitute harmless error. The amount of evidence in this case demonstrating that outboard engines and stern drive engines are in separate product markets was overwhelming.

The Court's decision to exclude the expert testimony of Stephen Humphries was fully explained in the Court's Order of May 20, 1998, and Brunswick makes no persuasive argument suggesting that the Order was erroneous. A party simply cannot wait until its opponent rests, and then seek to vastly expand the subject matter of expert testimony to areas that had never been properly disclosed in accordance with firm disclosure deadlines. Furthermore, it makes no difference that Humphries received some data after the disclosure deadline of March 16, 1998. The trial of this matter commenced on April 13, 1998, and Brunswick had ample opportunity to file a timely request to supplement.

Brunswick objects to the Court's verdict form, basically repeating its disaggregation argument addressed in Section III, *supra*. Because there is not a disaggregation problem, this issue does not warrant a new trial. Brunswick also argues that certain interrogatories should have been included in the verdict. The submission and form of interrogatories to the jury are matters within the sound discretion of the trial court. *E.I. du Pont de Nemours & Co. v. Berkley and Co.*, 620 F.2d 1247, 1271 (8th Cir.1980). The proposed interrogatories were, quite simply, unnecessary and misleading, and the Court was justified in omitting them.

Brunswick further argues that the Court's instructions to the jury contained prejudicial errors and omissions. A district court's decision to reject a proffered jury instruction is improper only if when viewed in their entirety, the jury instructions contain an error or errors that affect the substantial rights of the parties. *Hastings v. Boston Mut. Life Ins. Co.*, 975 F.2d 506, 510 (8th Cir.1992). "[T]he district court has discretion in the style and wording of jury instructions so long as the charge as a whole fairly and adequately states the law." *Beckman v. Mayo Found.*, 804 F.2d 435, 438 (8th Cir.1986). Furthermore, "[where] the charge to the jury correctly sets forth the law, a lack of perfect clarity will not render the charge erroneous." *Roth v. Black & Decker, U.S., Inc.*, 737 F.2d 779, 783 (8th Cir.1984).

The Court finds that the jury was properly instructed on the definition of monopoly power, as the instruction was in full accord with established Supreme Court and Eighth Circuit precedent. Brunswick's argument with respect to Instruction No. 17 has no merit. First, the instruction itself is not an instruction on the law because it only recites several categories of conduct which Plaintiffs maintained were anticompetitive. Furthermore, the instructions as a whole fairly and adequately stated the law.

## XI.

In accordance with the above, Defendant Brunswick Corporation's Renewed Motion

for Judgment as a Matter of Law (Docket # 1239) and separate Motion for a New Trial (Docket # 1240) are hereby DENIED.