# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3732

_____

Concord Boat Corporation; Galaxie      *
Boat Works, Inc.; Sea Arrow Marine,      *
Inc.; Mariah Boats, Inc.; Harris Kayot,      *
Inc.; Armada Manufacturing Company,      *
Inc.; Baha Cruisers/FRP Industries, Inc.;      *
Campion Marine, Inc.; Caravelle Boats;      *
KCS International/Cruisers, Inc.; Mirage      *
Holdings, Inc.; Play Time      *
Manufacturing By Ohio Marine      *
Distributor, Inc.; Powerquest Boats,      *      Appeal and Cross Appeal from the
Inc.; Silverton Marine Corporation;      *      United States District Court for
Independent Boat Builders, Inc.; WTYS      *      the Eastern District of Arkansas.
No. 4 Inc., doing business as Thompson      *
Boat Co.; Century Craft Industries, Ltd.,      *
formerly known as Vanguard Industries;      *
Avenger Manufacturing; G W Invader;      *
Malibu Boats West; Maverick Boat      *
Company, Inc.; Weeres Industries      *
Corporation; Doral International, Inc.;      *
Albermarle Boats, Inc.,      *
     *
         Plaintiffs - Appellees,      *
    v.      *
     *
Brunswick Corporation, a Delaware      *
corporation,      *
     *
         Defendant - Appellant,      *
_____      *

National Association of Manufacturers,      *

Amicus on Behalf of Appellant.          *

                                         *

_____

98-4042

_____

Concord Boat Corporation; Galaxie          *
Boat Works, Inc.; Sea Arrow Marine,        *
Inc.; Mariah Boats, Inc.; Harris Kayot,    *
Inc.; Armada Manufacturing Company,        *
Inc.; Baha Cruisers/FRP Industries, Inc.;  *
Campion Marine, Inc.; Caravelle Boats,     *
Inc.; KCS International/Cruisers, Inc.;     *
Mirage Holdings, Inc.; Play Time           *
Manufacturing By Ohio Marine               *
Distributor, Inc.; Powerquest Boats,       *
Inc.; Silverton Marine Corporation;        *
Thompson Boat Company; Independent         *
Boat Builders, Inc.; WTYS No. 4 Inc.,      *
doing business as Thompson Boat            *
Company; Century Craft Industries, Ltd.,   *
formerly known as Vanguard Industries;     *
Avenger Manufacturing; G W Invader;        *
Malibu Boats West; Maverick Boat           *
Company, Inc.; Weeres Industries           *
Corporation; Doral International, Inc.;     *
Albermarle Boats, Incorporated,            *

                                           *

          Plaintiffs - Appellants,         *

     v.                                    *

                                           *

Brunswick Corporation, a Delaware          *
corporation,                               *

                                           *

          Defendant - Appellee,            *

-2-

_____

National Association of Manufacturers,    \*

    \*

    Amicus on Behalf of Appellee.    \*

_____

Submitted:  September 15, 1999

Filed:  March 24, 2000

_____

Before McMILLIAN and MURPHY, Circuit Judges, and BOGUE,[1] District Judge.

_____

MURPHY, Circuit Judge.

A number of boat builders[2] brought this antitrust action against stern drive engine manufacturer Brunswick Corporation (Brunswick) for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1994), and of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1994). Brunswick counterclaimed, arguing that the boat builders had themselves conspired to restrain trade in violation of Section 1 of the Sherman Act. The case was tried to a jury for ten weeks, and a verdict was returned in favor of the boat builders for $44,371,761. Post trial motions were filed by both sides, and judgment was eventually entered for the boat builders in the amount of $133,115,283, plus $7,783,224 in attorney fees and $1,267,424 in costs. The district court granted

---

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

[2]The plaintiffs include twenty four corporations that manufacture and sell recreational boats; they are located in various states, including Arkansas, California, Florida, Illinois, Indiana, Kentucky, Texas, Michigan, Minnesota, New Jersey, North Carolina, Ohio, Washington, Wisconsin, and Canada. An additional party plaintiff is an Illinois buying cooperative composed of recreational boat manufacturers.

Brunswick's motion for judgment as a matter of law on its counterclaim, but denied its motions for a new trial and for judgment as a matter of law on the boat builders' claims. It also denied the boat builders' motion for equitable relief. Both sides appeal, and we reverse.

## I.

## A.

Neither side contests the finding of the jury that the relevant market is the market for inboard and stern drive marine engines. Since the early 1980s there have been a number of manufacturers in the market, including inboard manufacturers PCM, Indmar, Crusader, Volvo, Marine Power, MTU, Caterpillar, Detroit Diesel, Cummins, and Toyota, and stern drive manufacturers Brunswick, Outboard Marine Corporation (OMC), Volvo Penta of the Americas (Volvo), and Yamaha. In this opinion we employ the term "stern drive engines" to include both types of engines.

The manufacturers use standard automobile engine blocks to make stern drive engines for motor boats. They "marinize" the automobile engines and equip them with a drive system and then sell them to boat builders who may be affiliated with the manufacturer or may be independent buyers. The boat builders install the engines in their brand name boats and sell the completed boats to dealers. Stern drive engines are used primarily in recreational power boats known as runabouts, which are typical water skiing boats, and in cruising boats, which are larger and more expensive boats and usually have cabins. Runabouts and cruising boats together make up about 40% of all recreational power boats.

Brunswick has been the market leader in stern drive engine manufacturing for many years, and by 1983 it had earned a 75% market share. Beginning in 1982 it employed McKinsey & Company (McKinsey) to provide consulting services to its

engine business. McKinsey consultants suggested various ways for Brunswick to increase the sales of its engines. In 1984 Brunswick began to offer market share discounts to boat builders and dealers. Several of its competitors, including Volvo and OMC, also offered market share discounts at about the same time. Under the Brunswick programs, boat builders and dealers could agree to purchase a certain percentage of their engine requirements from Brunswick for a fixed period of time in exchange for a discount off the list price of the engine. From 1984 to 1994, Brunswick offered a 3% discount to boat builders who bought 80% of their engines from the company, a 2% discount for 70% of all purchases, and a 1% discount for those who took 60% of their needs from Brunswick. For the 1995 to 1997 model year program, the market share requirements were reduced so that the maximum 3% discount could be earned by buying 70% from Brunswick; customers could receive a 2% discount for 65% market share and 1% for 60% market share. Another feature was added to the program in 1989 to offer long term discounts of an additional 1 or 2% to anyone who signed a market share agreement for two to three years.[3] Boat builders also could receive a volume discount of up to 5% based on the quantity of engines purchased. Brunswick attempted to increase its market share requirement to 95% in its proposed 1994 "Industry Growth Program," but was unsuccessful due to serious backlash from boat builders. The market share discounts were eliminated entirely in the middle of 1997.

Neither the regular market share discount program, the long term program, nor

---

[3]Four financially troubled boatbuilders--Baja, Porter, Pro-Line, and Fountain-- entered into long term contracts with Brunswick in exchange for financial assistance. The contracts were for three to five years and, in the case of Baja and Porter, they contained some provisions extending beyond five years. The Baja and Fountain contracts required those companies to purchase 100% of their engines from Brunswick. Porter was required to purchase 99%, and Pro-Line's contract contained a 50% market share threshold. The boat builders' expert testified that these companies made up about 5% of the stern drive engine market. See Tr. at 1179.

the volume discount program obligated boat builders and dealers to purchase engines from Brunswick, and none of the programs restricted the ability of builders and dealers to purchase engines from other engine manufacturers. Builders and dealers were able to buy up to 40% of their engines from other manufacturers and still obtain a discount from Brunswick. Several boat builders chose to take a higher percentage of their engines from Brunswick than necessary to qualify for its largest market share discount; some purchased 95 or 100% of their engines from Brunswick.

In the year after Brunswick and other stern drive engine manufacturers instituted market share discount programs, Brunswick's largest domestic competitor, OMC, introduced a new stern drive engine called the "Cobra." The Cobra engine registered solid early sales, which increased OMC's stern drive engine market share and simultaneously reduced Brunswick's market share to approximately 50%. Brunswick began exploring its competitive options, and in December 1986 it purchased two of the largest boat builders, U.S. Marine (Bayliner) and Ray Industries (Sea Ray).[4] These purchases were noted throughout the boating industry. Brunswick hoped this vertical integration would enable it to synthesize engine manufacturing and boat building, leading to a higher quality and less expensive product.

---

[4]Brunswick also made several other acquisitions that were not part of the main focus of the boat builders' Clayton Act claims. In 1987 it made a small asset purchase from BMW Marine Diesel, a European diesel engine manufacturer; Brunswick hoped this would enable it to compete with Volvo in Europe. See Tr. at 4552. In 1990 it acquired Kiekhaefer Aeromarine, which annually produced about sixty high performance stern drive engines that were priced at more than $50,000. Neither of these acquisitions involved products that competed in the relevant market, nor did they occur during the limitations period. See discussion Part III.A. The boat builders characterized both companies as "small players" in their closing argument at trial. See Tr. at 6632. In 1995 Brunswick bought boat builder Baja Cruisers which had 2.8% of the stern drive engine market; the boat builders' expert testified that Baja was not really a significant player in the market. See id. at 1178, 1189.

Other events occurred about this time which improved Brunswick's competitive position. OMC's success with the Cobra was short lived because the company began receiving complaints that the engine's shift cable was defective. After a year investigating complaints, OMC was forced to recall all of its Cobra engines in 1989. This resulted in significant market share gains by Brunswick. Brunswick also experienced a market share gain in 1993 as a result of mistakes made by Volvo and OMC when they merged, leading to decreased consumer confidence in their products. In 1994 Yamaha, another stern drive engine manufacturer, left the market. The price of Brunswick's stern drive engine increased between 1986 and 1997 from $4775 to $4984, fluctuating both upward and downward in the interim.

B.

The boat builders filed this antitrust suit in 1995, more than ten years after Brunswick and other stern drive engine manufacturers first instituted market share discount programs, and over nine years after Brunswick acquired Bayliner and Sea Ray. They alleged that Brunswick had violated Section 7 of the Clayton Act by acquiring Bayliner and Sea Ray in 1986 and subsequently holding them, enabling Brunswick to create a monopoly in the stern drive engine market. They contended that Brunswick had used its market share discounts, volume discounts, and long term discounts and contracts, coupled with the market power it had achieved in purchasing Bayliner and Sea Ray, to restrain trade and to monopolize the market in violation of Sections 1 and 2 of the Sherman Act. According to the boat builders, Brunswick's monopolization of the market enabled it to charge supracompetitive high prices for their engines, which drove other engine manufacturers out of business. The boat builders also claimed that Brunswick had fraudulently concealed both the special deals that they gave to certain boat builders and the stern drive engine that Bayliner was developing.

Brunswick denied the allegations and counterclaimed against several of the boat

builders, alleging that they had conspired to boycott Brunswick engines at industry boat shows and to price Brunswick engines higher than competitors' engines in violation of Section 1 of the Sherman Act. Brunswick also brought three state law counterclaims against two of the boat builders, alleging that they had submitted falsified market share affidavits.

Both sides filed pretrial motions, including Brunswick's motion in limine to limit the testimony of Dr. Robert Hall, the expert witness for the boat builders. Brunswick argued that Dr. Hall's economic model was unreliable and did not have the capacity to distinguish between lawful and unlawful market behavior; his opinion therefore could not provide the jury with an adequate basis to assess antitrust liability or damages. At a pretrial Daubert hearing,[5] the boat builders assured the district court that Dr. Hall's testimony and economic model would segregate unlawful conduct by Brunswick from lawful behavior that had contributed to its market share. The district court did not make specific findings regarding Dr. Hall's methodology or the bases of his opinions, but it ruled that the jury could draw its own conclusions about the value of his testimony.

During the course of the ten week trial, both parties called numerous witnesses and presented over 800 exhibits, including voluminous economic data, charts and graphs made in the course of business and for trial purposes, internal business memoranda, consultants' reports, deposition testimony, and much more. The boat builders called over 30 witnesses, many of whom testified by videotaped deposition. Among these witnesses were owners of some of the plaintiff boat building companies, as well as several current and former Brunswick employees. Brunswick called some 15 witnesses, including its own employees and owners of boat building companies and boat dealerships. Expert witnesses presented differing interpretations of stern drive engine market events and of Brunswick's conduct in that market.

---

[5]See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993).

The boat builders' primary evidence to establish Brunswick's antitrust liability was presented by their sole expert, Dr. Hall, a professor of economics at Stanford University. He testified that Brunswick had monopoly power in the stern drive market that enabled it to use its market share discount programs to impose a "tax" on boat builders and dealers who chose to purchase engines from other manufacturers. He defined the "tax" as the discount these purchasers gave up by not buying from Brunswick. He stated that Brunswick's program effectively required its competitors to charge substantially lower prices in order to convince customers to purchase from them and forgo the discount. Dr. Hall further testified that the discount programs, combined with the market power Brunswick acquired by purchasing Bayliner and Sea Ray, enabled Brunswick to capture 78% of the stern drive engine market. According to Dr. Hall, other manufacturers could not enter into stern drive engine manufacturing as a result of Brunswick's having such a high percentage of the market. He concluded that the discount programs were anticompetitive.

In support of the boat builders' damage claim, Dr. Hall relied on the Cournot model of economic theory that posits that a firm "maximizes its profits by assuming the observed output of other firms as a given, and then equating its own marginal cost and marginal revenue on that assumption." 4 Phillip E. Areeda et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 925a (rev. ed. 1998). Dr. Hall postulated that in a stern drive engine market that was competitive, Brunswick and some other firm would each maintain a 50% market share. Under this theory, any market share over 50% would be evidence of anticompetitive conduct on Brunswick's part. Since Brunswick at various points in time had garnered a market share as large as 78% percent, Dr. Hall concluded that it had engaged in anticompetitive conduct and that the boat builders had been overcharged at the moment Brunswick's market share surpassed the 50% threshold.

Brunswick moved for judgment as a matter of law at the close of the boat builders' case. The district court heard arguments on the motion but declined to rule

on it at that stage.  Brunswick then called its various witnesses, including two expert witnesses.  Dr. Frederick Warren-Boulton, former chief economist for the Antitrust Division of the United States Department of Justice, testified that Brunswick's discount programs served efficiency and business purposes by improving the predictability of engine demand and by helping to keep manufacturing costs to a minimum.  He explained that the discount programs encouraged competition in the boat building industry by providing discounts to smaller boat builders who otherwise would not be able to order sufficient quantities of engines to qualify for strict volume discounts.  Dr. Richard Rapp, an economist who is president of National Economic Research Associates, testified that there was no rational basis by which Dr. Hall's model could identify alleged overcharges.  He pointed out that the Hall model used a mechanical formula to determine Brunswick's alleged overcharge percentage for any year.  The only independent variable in the formula was Brunswick's stern drive market share. See Tr. at 5288-91.  According to the formula, an overcharge was calculated anytime Brunswick's market share surpassed 50%. See id.  The price at which Brunswick sold its engines was therefore irrelevant for purposes of the formula because the overcharge amount was related solely to Brunswick's market share. See id.

The case was submitted to the jury with a detailed verdict form divided into a number of sections.[6]  The jury deliberated for a day and a half before returning its verdict.  It found that Brunswick had violated three antitrust statutes, Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.  The jury awarded a total of $44,371,761 in answer to a question that asked it to assess the individual damages suffered by each boat builder as a result of Brunswick's "antitrust violation or violations."  Although the jury found liability for all three antitrust claims, the form of the verdict did not require it to specify what amount of damages was caused by each type of antitrust violation.  The jury was asked, however, to consider damages for three

_____

[6]A copy of the verdict form with the jury's answers is attached to this opinion. See Appendix.

separate time periods: one ending December 7, 1991,[7] one from that date to the day of the verdict, and one for the post verdict period. It found damages only for the period starting December 7, 1991, and running to June 19, 1998, the date of the verdict. It rejected the boat builders' fraudulent concealment claim, which would have extended the four year limitations period, by awarding no damages for the period before December 7, 1991. The jury also found for the boat builders on Brunswick's counterclaim for unreasonable restraint of trade in violation of Section 1 of the Sherman Act and for state law violations.

C.

Both sides filed post trial motions. Brunswick moved for judgment as a matter of law on Count 1 of its counterclaim, alleging that the boat builders had engaged in a per se unlawful conspiracy to boycott its engines at industry boat shows and to price its engines at a disadvantage to its competitors. The boat builders filed a protective motion for judgment as a matter of law on Brunswick's counterclaim in the event the court were to overturn the jury verdict. The district court granted Brunswick's motion on Count 1 of its counterclaim, concluding as a matter of law that the boat builders had committed a per se violation of Section 1 of the Sherman Act. It awarded Brunswick only nominal damages of $1, however, because of a failure of proof. The boat builders filed a renewed motion for judgment as a matter of law, or alternatively for reconsideration of the order granting Brunswick judgment on its antitrust counterclaim. This motion was denied, and neither side has appealed the final resolution of Brunswick's counterclaim.

Brunswick also filed a renewed motion for judgment as a matter of law and for a new trial on the boat builders' claims. In support of its motion for judgment,

_____

[7]December 7, 1991 was four years before the day on which this action was filed, December 7, 1995.

-11-

Brunswick attacked both the jury's finding of liability and its calculation of damages. It contended that Dr. Hall's testimony should have been limited by the court because his opinion had no basis in the economic reality of the stern drive engine market. Brunswick further claimed that his model was flawed because it failed to account for market share gains that resulted from lawful competitive activity and from market events unrelated to its conduct. Brunswick argued that the jury adopted all aspects of Dr. Hall's presentation and theory and thus awarded damages for losses due to factors other than any anticompetitive conduct. Brunswick also argued that its market share discount programs were not anticompetitive because they were above cost and were not unlawfully exclusionary. Finally, Brunswick contended that the boat builders had not presented sufficient evidence to sustain the jury's verdict on any of their claims and that the Clayton Act claims were barred by the statutory limitations period. Brunswick's motion for a new trial raised many of the same issues. It argued that the jury verdict went against the weight of the evidence, that the damages awarded were grossly excessive, that Dr. Hall's testimony was unfairly prejudicial, and that the plaintiffs were awarded damages for conduct that was not anticompetitive. The district court denied both motions.

The boat builders filed a motion for equitable relief seeking orders to divest Brunswick of Bayliner and Sea Ray,[8] to proscribe Brunswick's use of market share discount programs, and to prohibit it from further violation of the antitrust laws. The district court also denied this motion. It ruled that the boat builders' request for

---

[8]In denying equitable relief to the boat builders, the district court indicated that they had asked for an "order that Brunswick divest itself within twelve months of its US Marine [Bayliner] and Sea Ray boat manufacturing divisions . . . ." Order of Oct. 16, 1998 at 7. The boat builders apparently had not specifically requested divestiture of Baja, which was being operated as part of the Sea Ray division. The court held that "[i]n light of the record as a whole, the balance of equities precludes *any* award of divestiture, including the divestiture by Brunswick of Baja . . . ." Id. at 13 (emphasis in original).

divestiture was barred by laches in light of the jury's finding of no damages prior to December 7, 1991 and that the balance of equities precluded any order to divest. It also refused to enjoin market share discount programs, again citing laches and no showing of irreparable harm. Finally, the court rejected the boat builders' request to enjoin Brunswick from violating assorted antitrust laws on the grounds that such an injunction would be imprecise, impossible to monitor and enforce, and so broad that it potentially could preclude Brunswick from engaging in legitimate business activity.

Following its rulings on the various post trial motions, the district court trebled the damages found by the jury and awarded the boat builders $7,783,223.94 in attorney fees and $1,267,424.18 in costs. See Concord Boat Corp. v. Brunswick Corp., 34 F. Supp.2d 1125, 1134 (E.D. Ark. 1998). The final award totaled $142,165,931.12.

II.

Brunswick argues on appeal that it is entitled to judgment as a matter of law because the boat builders' Clayton Act claims were barred by the statute's four year limitations period and because the evidence was insufficient as a matter of law to enable a reasonable jury to find that Brunswick's discount programs and acquisitions restrained trade and monopolized the market in violation of the Sherman Act. Brunswick contends that above cost discounting and vertical integrations constitute competitive business behavior that should be encouraged because of the resulting benefits for consumers and purchasers.[9] It also claims that Dr. Hall's testimony should

---

[9]The National Association of Manufacturers (NAM) has submitted an amicus curiae brief supporting Brunswick's position that this type of discount program results in lower prices for consumers. NAM's 14,000 member companies and subsidiaries, which include 10,000 small manufacturers, employ approximately 85% of all manufacturing workers in the United States and produce over 80% of the nation's manufactured goods. See Amicus Curiae Br. for the National Association of Manufacturers at 1. It states that this case has significant implications for potential

not have been admitted because his approach did not provide a reasonable basis for either liability or damages. His opinion that competitive conduct would have resulted in a "50-50 lockstep duopoly" in the market was without factual support, wholly speculative, and methodologically unsound according to Brunswick. See Def.'s Br. at 61. In support of its motion for a new trial Brunswick says that the boat builders' Clayton Act claims were not timely filed, that it is not possible to know what part of the antitrust damages awarded by the jury resulted from the Clayton violations it found, and that Dr. Hall's expert opinion should not have been admitted.

The boat builders contend that their evidence was sufficient to permit a reasonable jury to find that Brunswick had used its discounts and acquisitions to restrain trade and monopolize the market in violation of the Sherman Act. They claim that they proved that Brunswick's monopolization of the engine market resulted in higher engine prices which forced its primary rivals, Volvo and OMC, to merge in 1993 and resulted in Yamaha's departure from the market in 1994. They also argue that the statute of limitations does not bar their Clayton Act claims because Brunswick's purchases of Bayliner and Sea Ray were part of a continuing violation and because their damages were only speculative during the limitations period. They also contend that there was no need for the jury to be asked to tie any damages to a particular type of antitrust violation and that the damage award can be sustained if any of their antitrust claims are upheld. Finally, the boat builders cross appeal from the denial of their motion for equitable relief, but they do not appeal the jury's rejection of their fraudulent concealment claim.

We review de novo the denial of a motion for judgment as a matter of law, using the same standards as the district court. See Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1505 (8th Cir. 1992), cert. denied, 506 U.S. 1080 (1993). Judgment as a matter

antitrust liability for its members should they choose to offer above cost, non exclusive discounts to consumers. See id. at 2.

-14-

of law is appropriate "[i]f during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party . . . ." Fed. R. Civ. P. 50(a)(1). We "must assume as proven all facts that the nonmoving party's evidence tended to show, give her the benefit of all reasonable inferences, and assume that all conflicts in the evidence were resolved in her favor." Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997). Applying this standard, the motion "must be granted when the non-movant's case rests solely upon speculation and conjecture lacking in probative evidentiary support." Johnson v. Niagra Mach. & Tool Works, 666 F.2d 1223, 1225 (8th Cir. 1981) (internal quotations and citation omitted). This is because the non-moving party, while entitled to all supportable inferences, is not given "the benefit of unreasonable inferences or those at war with the undisputed facts." Sip-Top, Inc. v. Ekco Group, Inc., 86 F.3d 827, 830 (8th Cir. 1996) (citations and internal quotations omitted). A motion for judgment as a matter of law should be granted if, when considering the evidence in this manner, "'without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict.'" McGreevy v. Daktronics, Inc., 156 F.3d 837, 840 (8th Cir. 1998) (citing Sip-Top, Inc., 86 F.3d at 830); see also Ryther v. KARE 11, 108 F.3d 832, 844 (8th Cir.) (en banc), cert. denied, 521 U.S. 1119 (1997). We review the denial of a motion for a new trial under an abuse of discretion standard. See Wood v. Minnesota Mining & Mfg. Co., 112 F.3d 306, 311 (8th Cir. 1997).

III.

A.

The boat builders claim that Brunswick's purchases of Bayliner and Sea Ray in December 1986 and its continuing holding of them served "substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act. 15 U.S.C. § 18 (1994). Brunswick argues that these claims are barred by the statute's limitations period and that its acquisitions were not anticompetitive as a matter

-15-

of law.  Section 7 of the Clayton Act protects against more than one type of anticompetitive conduct, but all cases are governed by the limitations period in Section 4B that requires that an action be commenced "within four years after the cause of action accrued."  15 U.S.C. § 15b (1994).

Section 7 "is primarily aimed at arresting, at their incipiency, acquisitions and mergers that substantially lessen competition or tend to create a monopoly." Midwestern Mach., Inc. v. Northwest Airlines, Inc., 167 F.3d 439, 442 (8th Cir. 1999) (citing United States v. E.I. du Pont de Nemours & Co., 353 U.S. 586, 589 (1957)). An antitrust cause of action generally "accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business."  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338 (1971).  A Section 7 action challenging the initial acquisition of another company's stocks or assets accrues at the time of the merger or acquisition.  See Midwestern Mach., Inc., 167 F.3d at 442-43.  Brunswick acquired Bayliner and Sea Ray in December 1986, and the cause of action for these widely publicized transactions accrued at that time.  The statute's four year limitations period for the initial acquisitions therefore expired in 1990.  Since this action was not filed until 1995, Section 7 claims based on Brunswick's initial acquisitions are time barred.

Clayton Act claims are not limited to challenging the initial acquisition of stocks or assets, however, since "'holding as well as obtaining assets' is potentially violative of section 7."  Midwestern Mach., Inc., 167 F.3d at 443 (quoting United States v. ITT Continental Baking Co., 420 U.S. 223, 240 (1975)).  A Clayton Act violation may occur "'at or any time after the acquisition, depending upon the circumstances of the particular case.'"  Id. (quoting E.I. du Pont de Nemours & Co., 353 U.S. at 597). "[W]hile the primary thrust of § 7 is to prohibit and thus to forestall anti-competitive and monopolistic acquisitions," completed acquisitions and "post-acquisition conduct may amount to a violation of § 7."  Id. (internal quotations and citations omitted).  The rationale for extending Section 7 liability beyond the acquisition itself is that "'as a

practical matter it often may be difficult to foresee and evaluate the real impact and effect of an acquisition until the transaction has been completed and the aggregate combine is operating.'" Id. at 442-43 (quoting Carlson Cos. v. Sperry & Hutchinson Co., 507 F.2d 959, 962 (8th Cir. 1974)).

Section 7 actions challenging the holding or use of assets remain subject to the four year limitations period, and the normal antitrust accrual rule applies. The limitations period thus starts to run at "the point the act first causes injury." Klehr v. A.O. Smith Corp., 521 U.S. 179, 190-91 (1997) (citing Zenith Radio Corp., 401 U.S. at 339-40); E.I. du Pont de Nemours & Co., 353 U.S. at 598 (action accrues when "threat of the prohibited effects is evident"); ITT Continental Baking Co., 420 U.S. at 242 (antitrust action accrues later when there is "no realistic threat of restraint of commerce or creation of a monopoly" at the initial acquisition); Midwestern Mach., Inc., 167 F.3d at 442 n.3 (sweep of Section 7 claims restricted by the statute of limitations, laches, and problems of proof and causation). The statute can be tolled under certain circumstances, such as where a defendant has engaged in fraudulent concealment, see Kansas City, Mo. v. Federal Pacific Elec. Co., 310 F.2d 271 (8th Cir.), cert. denied, 371 U.S. 912 (1962), or where a plaintiff's damages are only speculative during the limitations period, see Zenith Radio Corp., 401 U.S. at 338-42.

The record indicates that the boat builders did not prove that the statute of limitations was tolled or that the limitations period was extended, unlike the plaintiffs in Midwestern Machinery, E.I. du Pont de Nemours & Company, and ITT Continental Baking Company. The limitations period in this case cannot be extended on the basis of the holding and use of the acquisitions because the evidence at trial showed that the boat builders' injury accrued in 1986. Brunswick's purchases of Bayliner and Sea Ray were public information at the time of acquisition and were well known throughout the boat manufacturing industry. See Tr. at 1929. At trial the boat builders provided the jury with damage calculations for each year beginning in 1986, and these calculations were based solely on Brunswick's market share. This showed that the damages

resulting from any injury based on Brunswick's holding and use of Bayliner and Sea Ray could have been quantified as early as 1986. Brunswick's market share was the only independent variable in the boat builders' damage formula, and it was easily calculable at that time. Moreover, in 1990 the boat builders' buying cooperative, Independent Boat Builders, Incorporated (IBBI), advised its members to declare Brunswick's practices "in violation of the Sherman Anti-Trust Act." Def.'s Ex. 318. This advice would have alerted the boat builders to investigate whatever violations of the antitrust laws might have been committed by Brunswick's holding and use of the companies it had acquired.

Thus, by 1990 at the very latest the boat builders were aware of their alleged injuries and of their potential Section 7 claims with regard to Brunswick's holding and use of Bayliner and Sea Ray. As the Seventh Circuit has noted,

> the statute of limitations is not tolled simply in order to wait and see just how well the defendant does in the market from which he excluded the plaintiff. Otherwise it would be tolled indefinitely in a very large class of antitrust suits.

Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 271 (7th Cir. 1984), cert. denied, 472 U.S. 1018 (1985). If the rule were different, a merger or acquisition could be subject to continual challenge under Section 7. See Midwestern Mach., Inc., 167 F.3d at 442 n.3.

The boat builders also claim that Brunswick's holding of Bayliner and Sea Ray resulted in a continuing violation, but they cite no appellate decision applying that concept in a Section 7 case. Continuing violations typically arise in the context of Sherman Act or RICO[10] claims where multiple defendants are alleged to be part of an ongoing conspiracy. See, e.g., Zenith Radio Corp., 401 U.S. at 338 (Sherman Act

---

[10]See Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-68 (1994).

conspiracy); Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15 (1968) (Sherman Act refusal to deal); Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 406 (6th Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3491 (U.S. Nov. 10, 1999) (No. 99-1232) (Robinson-Patman price discrimination scheme); Hugh Chalmers Motors, Inc. v. Toyota Motor Sales U.S.A., Inc., 184 F.3d 761, 763 (8th Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3391 (U.S. Dec. 1, 1999) (No. 99-934) (antitrust conspiracy involving product tying, price discrimination, restraint of trade, and monopolization).  In such a situation, the statute of limitations runs from the last "overt act."  Grand Rapids Plastics, Inc., 188 F.3d at 406 (internal quotations and citation omitted).  Continuing violations have not been found outside the RICO or Sherman Act conspiracy context, however, because acts that "simply reflect or implement a prior refusal to deal or acts that are merely unabated inertial consequences (of a single act) do not restart the statute of limitations."  DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467-68 (6th Cir. 1996) (citations and internal quotations omitted).

Even if a continuing violation analysis were applicable to the Section 7 claims here, the boat builders have not shown any overt act that would restart the limitations period. The holding or use of assets is by its nature an "unabated inertial consequence[]" of the initial acquisition.  DXS, Inc., 100 F.3d at 467 (internal quotations and citations omitted).  Where a company is merely holding or using assets in the same manner as at the time of acquisition, there is no "separate new overt act" to restart the limitations period as is found, for example, in each new sale by a Sherman Act price fixing defendant.  Cf. Klehr, 521 U.S. at 189.  Rather than engaging in another sale or overt act, this type of defendant simply continues to hold or use an asset.  If this were enough to make out a continuing violation, there would in effect be no statute of limitations since a Section 7 challenge to the holding or use of assets could be brought at any time.  The policy reasons for the four year statutory limitations period for acquisition claims have been discussed by the Ninth Circuit:

[t]he four-year limitation of Clayton Act § 4B for private antitrust actions for damages is long enough to enable potential plaintiffs to observe the actual effects of a possible antitrust violation and to calculate its potential effects. The abuses which would occur if plaintiffs were permitted to search the history of other firms and challenge at their pleasure any possible violations, no matter how old, seem apparent.

International Tel. & Tel. Corp. v. General Tel. & Elecs. Corp., 518 F.2d 913, 929 (9th Cir. 1975), overruled on other grounds, California v. American Stores Co., 495 U.S. 271 (1990).

The boat builders rely on a civil RICO case and two district court cases in arguing that a continuing violation can be found in the Section 7 context. See Klehr, 521 U.S. at 189; see also Teletronics Proprietary, Ltd. v. Medtronic, Inc., 687 F. Supp. 832, 842-44 (S.D.N.Y. 1988); Julius Nasso Concrete Corp. v. DIC Concrete Corp., 467 F. Supp. 1016, 1022-25 (S.D.N.Y. 1979). In Klehr the Supreme Court considered the four year antitrust limitations period in deciding when a RICO cause of action accrues and the limitations period starts to run:

Antitrust law provides that, in the case of a "continuing violation," say, a price fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, "each overt act that is part of the violation and that injures the plaintiff," *e.g.*, each sale to the plaintiff, "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times."

Id. at 189 (internal quotations and citations omitted). The Court cited only Sherman Act cases, however, and did not discuss Section 7 Clayton claims. Although the boat builders contend that "[n]umerous courts have applied Zenith to Clayton § 7 actions and held that the cause of action accrues each time an injury is incurred," Pls.' Br. at 58, neither of the cited district court cases discussed continuing injuries. Those plaintiffs instead alleged that merged companies began holding or using assets differently at some time after the acquisitions and that this subsequent change affected the running

of the limitations period. Here, however, the boat builders never pointed to evidence showing that Brunswick was holding or using Bayliner and Sea Ray differently than when it originally acquired them, and the continuing violation exception to the limitations period does not apply to save their Section 7 claims from being time barred.

Giving the boat builders the benefit of all reasonable inferences from the evidence, their alleged Section 7 injuries accrued at the latest in 1990 and their damages were then calculable. The four year statute of limitations started to run at that time and expired no later than 1994. Their action was not filed until December 7, 1995, and they have not shown that the statute was tolled or that the continuing violation exception applies. Their Section 7 claims are therefore time barred. Since the statute of limitations had run on the Section 7 claims, they should not have been submitted to the jury and Brunswick is entitled to judgment as a matter of law with respect to them.

B.

The parties disagree about what impact dismissal of the Clayton Act claims should have on the case on appeal since the verdict form did not ask the jury to allocate damages to each type of antitrust claim or to consider what damages were caused by each type of violation.

Brunswick believes it is entitled to a new trial on any remaining claims because the jury was not asked to specify the damages attributable to the individual theories of liability. It cites several Supreme Court and appellate decisions in support. In Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459-60 (1993), the Supreme Court overturned a Section 2 antitrust judgment because there was no way to know whether the jury had relied on an erroneously submitted claim in setting damages. Similarly in Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co., 370 U.S. 19, 29-30 (1962), the Court set aside an antitrust judgment where one theory of liability should

-21-

not have been submitted to the jury. Many other cases have reached similar results if a jury might have relied on erroneously submitted claims. See, e.g., Robertson v. Norton Co., 148 F.3d 905, 908 (8th Cir. 1998); Dakota Indus., Inc., v. Ever Best Ltd., 28 F.3d 910, 912 (8th Cir. 1994); Dudley v. Dittmer, 795 F.2d 669, 673 (8th Cir. 1986); Northeastern Tel. Co. v. American Tel. & Tel. Co., 651 F.2d 76, 94-95 (2d Cir. 1981), cert. denied, 455 U.S. 943 (1982); see also Barber v. Whirlpool Corp., 34 F.3d 1268, 1278 (4th Cir. 1994).

The boat builders argue that the entire damage award may be upheld even when based on Brunswick's Sherman Act liability alone, but they provide no persuasive authority for their theory. They cite a civil rights case dealing only with alternate grounds for summary judgment, see Duffy v. Wolle, 123 F.3d 1026, 1035 n.5 (8th Cir. 1997), cert. denied, 523 U.S. 1137 (1998), and a distinguishable antitrust case, see General Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 800-01 (8th Cir. 1987). Hartz upheld a judgment on Section 2 grounds despite the erroneous submission of a Section 1 claim to the jury, but there the appellant had not challenged the form of special verdict or objected to it at trial. See Hartz, 810 F.2d at 801. Here, Brunswick alerted the district court at trial to the problems with the general verdict form and specifically objected to it on the grounds that it did not "account for the disaggregation principles that need to be addressed by the jury in order that the Court and, if necessary, the Court of Appeals can determine which conduct the jury thought was lawful versus which conduct was unlawful . . . ." Tr. at 6316-26. Moreover, the claims in Hartz were all brought under the Sherman Act; Section 7 of the Clayton Act was not implicated.

This case is like Spectrum Sports and Sunkist Growers, in that the jury considered an erroneously submitted claim in determining its verdict on damages. It found Brunswick liable for violating Section 7 of the Clayton Act and Sections 1 and 2 of the Sherman Act, but it is not possible to know what damages it found to have been caused by the acquisitions upon which the Section 7 claims were based. The

-22-

verdict form did not require the jury to consider what damages resulted from each type of violation.  See Barber, 34 F.3d at 1278.  The jury could have assigned millions of dollars in damages to a claim that should not have been submitted in the first instance because of the statute of limitations.  Had the verdict form included a damage question for each of the three statutory claims, it would have been possible to deduct from the total damage figure the amount awarded for the Section 7 claim.  See Mueller v. Hubbard Milling Co., 573 F.2d 1029, 1038 n.13 (8th Cir.), cert. denied, 439 U.S. 865 (1978) (special verdicts especially suited to multiple theories of liability).

Because there is no way to know what damages the jury assigned to the Section 7 claims based on the verdict form that was used, Brunswick would be entitled at the very least to a new damages trial on the boat builders' Sherman Act claims.

## IV.

Brunswick argues that another trial on the boat builders' Sherman Act claims is not required because it is entitled to judgment as a matter of law on those claims and the district court erred in not granting its motion for judgment.  Brunswick contends that its discount programs and acquisitions represented pro competitive business conduct that did not unreasonably restrain trade or monopolize the market.  The boat builders therefore did not suffer any antitrust injury, and they have not shown causation or damages.  The boat builders respond that Brunswick's discount programs amounted to de facto exclusive dealing and its acquisitions enabled it to foreclose a substantial share of the stern drive engine market and to charge supracompetitive high prices for its engines.

The boat builders' antitrust allegations claim damages based on the combined effect of Brunswick's market behavior over some ten years.  Under federal law treble damages are available to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ."  15 U.S.C. § 15 (1994).  In

order to prevail plaintiffs must prove for each claim "'an antitrust violation, the fact of damage or injury, a causal relationship between the violation and the injury, and the amount of damages.'"  Amerinet Inc., 972 F.2d at 1490 (quoting Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n, 666 F.2d 1130, 1146 (8th Cir. 1981), cert. denied, 457 U.S. 1111 (1982)); see also Green v. Associated Milk Producers, Inc., 692 F.2d 1153, 1157 (8th Cir. 1982).  Antitrust injury, causation, and damages all are necessary parts of the proof because "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation."  Hawaii v. Standard Oil Co., 405 U.S. 251, 262-63 n.14 (1972).

Because the boat builders presented the same evidence for their Section 1 and 2 claims, relying primarily on Dr. Hall to present the key evidence to support their theories of liability and causation, we examine Dr. Hall's presentation first and then turn to the separate antitrust claims.

## A.

Brunswick argues that Dr. Hall's expert opinion should have been excluded because it was contrary to undisputed record evidence and because it did not separate lawful from unlawful conduct.  The district court recognized that

> the task Dr. Hall faced in analyzing this case was an enormous one. Notwithstanding the complex nature of the conduct at issue, Dr. Hall was required to construct a hypothetical market, a "but for" market, free of the restraints and conduct alleged to be anticompetitive.  The difficulty of such a task has long been recognized by courts in antitrust cases . . . .

Concord Boat Corp. v. Brunswick Corp., 21 F. Supp.2d 923, 927 (E.D. Ark. 1998). Despite the inherent difficulty of the task, counsel for the boat builders assured the district court before trial that Dr. Hall's model would reflect the reality of the market

-24-

and would segregate any lawful acts and unrelated market events that might have contributed to Brunswick's market share from any anticompetitive conduct in order to enable the jury to assign damages only for illegal actions taken by Brunswick.

Counsel's assurances did not eliminate the need for a thorough analysis of the expert's economic model and his proffered opinion. Under Daubert the district court is to make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Among the factors to consider is whether the "'expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Id. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). The Court referred to this requirement as "fit," meaning that the expert testimony must not only be based on reliable science but must also "fit" the particular facts of the case. See id.

In recent years the Supreme Court has put renewed emphasis on the importance of the "fit" of an expert's opinion to the data or facts in the case:

> [C]onclusions and methodology are not entirely distinct from one another. . . . [N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytic gap between the data and the opinion proffered.

General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997); see also Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1082 n.3 (8th Cir. 1999). A court must focus on the "reasonableness of using such an approach, along with [the expert's] particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 154 (1999) (emphasis in original).

The district court commented that because Brunswick had not challenged the Cournot model as a scientific theory, its "criticisms are reduced to complaints about how Dr. Hall applied the Cournot model to the facts of this case." Concord Boat Corp., 21 F. Supp.2d at 934. If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate. See Kumho Tire Co., 526 U.S. at 154; Joiner, 522 U.S. at 146. Even a theory that might meet certain Daubert factors, such as peer review and publication, testing, known or potential error rate, and general acceptance,[11] should not be admitted if it does not apply to the specific facts of the case. See Kumho Tire Co., 526 U.S. at 154; Joiner, 522 U.S. at 146.

Not all relevant circumstances were incorporated into the expert's method of analysis related to antitrust liability. Dr. Hall's opinion that Brunswick's discount programs imposed a tax on boat builders who chose to purchase engines from other manufacturers is not supported by the evidence that some boat builders chose to purchase 100% of their engines from Brunswick when they only needed to purchase 80% to qualify for the maximum discount.[12] If Brunswick's market share had enabled it to charge supracompetitive high prices for its engines, presumably none of the boat builders would have chosen to purchase more than the minimum percentage required to receive the discount. There was other evidence that the boat builders were not unable to forgo Brunswick's discounts. For example, the boat builders wielded sufficient power over Brunswick to force it to scuttle its 1994 "Industry Growth Program," which would have raised the market share requirement to 95%, and their

[11]It is not clear how often the Cournot model has been employed in antitrust cases; a Westlaw search on February 3, 2000 did not find any other federal antitrust case discussing its application.

[12]The owner of Mariah Boats, for example, which was found by the jury to have suffered $16 million of the damages awarded to the boat builders, testified that when Brunswick lowered its market share discount level to 70% in 1994, "it was of no significance [to Mariah] because we were 90-plus anyway." Tr. at 2129.

-26-

reaction led to a reduction in market share levels for the 1995 to 1997 model year program.

Dr. Hall used the Cournot model to construct a hypothetical market which was not grounded in the economic reality of the stern drive engine market, for it ignored inconvenient evidence. The basis for his model was a theoretical situation in which some other manufacturer's engine would be viewed as equal in quality to Brunswick's. See Tr. at 1351. In this hypothetical market, Dr. Hall assessed an overcharge on each engine sold at any point where Brunswick possessed over the 50% market share he deemed permissible. The overcharge was described as the difference between the actual price paid by the boat builders and the price that would theoretically have existed in a more competitive market. This approach was not affected by the actual price at which Brunswick's engines were sold since the overcharge percentage was applied any time its market share surpassed 50%. As Dr. Hall testified but his opinion did not reflect, Brunswick had achieved a 75% share in the mid 1980s, before it started the market share discounts and before it acquired Bayliner and Sea Ray. See Tr. at 1392.

The model also failed to account for market events that both sides agreed were not related to any anticompetitive conduct, such as the recall of OMC's Cobra engine and the problems associated with the Volvo/OMC merger. Dr. Hall admitted on cross examination that such facts could have been incorporated into his model but that he had not done so:

> I did not numerically attribute--in other words, it wasn't some specific adjustment that you'll see in my computer spread sheet saying, "Here's what I did because of OMC." And that's because of the framework that I was working in. Remember, I was stepping back and saying, "What's a reasonable benchmark for what a freer market would have been?" . . . . Within that framework, there isn't a slot . . . [to get] down into the year by year details.
> . . . What I want to do is stand back and say what averaged over the years, with, of course, ups and downs.

Tr. at 1417-18. Dr. Hall testified about OMC's recall of its Cobra engine and admitted that the "decline in OMC's market share and the corresponding increase during this time period of Brunswick's market share is very much related to the switch-over in engines previously supplied by OMC . . . ." Tr. at 1249. The OMC/Volvo joint venture alone increased Brunswick's market share by as much as 10%. See Def.'s Ex. 1207 (letter dated May 21, 1993 from David Ball to IBBI members: Brunswick "picked up over 10 unearned market share points this past year due to the chaos created by the Volvo/OMC joint venture announcement"); Tr. at 4954 (testimony of David Ball, President of IBBI). There was also evidence that the boat builders did not hesitate to switch to OMC and Volvo when they offered superior discounts. Cf. SMS Sys. Maintenance Servs., Inc. v. Digital Equip. Corp., 188 F.3d 11, 19-20 (1st Cir. 1999), petition for cert. filed, 68 U.S.L.W. 3401 (U.S. Dec. 13, 1999) (No. 99-995) (actual behavior of customers more important than "self-serving testimony" of plaintiffs).

Dr. Hall's expert opinion should not have been admitted because it did not incorporate all aspects of the economic reality of the stern drive engine market and because it did not separate lawful from unlawful conduct. Because of the deficiencies in the foundation of the opinion, the expert's resulting conclusions were "mere speculation." Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F. Supp.2d 571, 580 (S.D.N.Y. 1999) (summary judgment appropriate on Section 1 and 2 claims because "an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case"). Expert testimony that is speculative is not competent proof and contributes "nothing to a 'legally sufficient evidentiary basis.'" Weisgram v. Marley Co., ---U.S.---, 120 S. Ct. 1011, 1015, 1020 (2000) (citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993)). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." Brooke Group Ltd., 509 U.S. at 242; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 n.19 (1986) ("[E]xpert opinion evidence . . . has little probative value in comparison with the economic factors . . . .").

An expert opinion cannot sustain a jury's verdict when it "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable . . . ." Brooke Group Ltd., 509 U.S. at 242; see also Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1108 (8th Cir. 1996) (motion for judgment should have been granted because the expert opinion on causation was speculative). An error in admission of evidence is reversible if the ruling affected a substantial right of a party. See Fed. R. Ev. 103(a); see also White v. Honeywell, Inc., 141 F.3d 1270, 1275 (8th Cir. 1998); cf. Fed. R. Civ. P. 61. Here Dr. Hall's expert opinion was the basis of the boat builders' damage case, and the jury clearly relied on his opinion in reaching its verdict because the damages it awarded to the individual boat builders were identical to the detailed figures Dr. Hall had calculated. Compare Pls.' Ex. 2556, and Tr. at 2608-46, with Appendix to this opinion. It cannot be said that the verdict would have been the same without the expert testimony, and its admission affected Brunswick's substantial rights. Brunswick's motion for judgment should have therefore been granted. See Weisgram, ---U.S.---, 120 S. Ct. at 1015.

B.

Brunswick argues that it is entitled to judgment as a matter of law on the boat builders' Sherman Act claims because of the improper expert testimony and because the other evidence presented by the boat builders was insufficient to demonstrate antitrust injury, causation, and damage. The boat builders argue that there is more than sufficient evidence in the trial record of Brunswick's anticompetitive conduct to support the jury's finding of liability and damages. Antitrust plaintiffs must prove an antitrust violation by a preponderance of the evidence. Cf. Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983). After a thorough examination of the record, we find that the boat builders failed to carry their burden of proof and Brunswick's motion for judgment should have been granted for this reason.

-29-

1.

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1 (1994).  To prove a Section 1 violation, a plaintiff must show an agreement in the form of a contract, combination, or conspiracy that imposes an unreasonable restraint on trade.  See Willman v. Heartland Hosp. E., 34 F.3d 605, 610 (8th Cir. 1994), cert. denied, 514 U.S. 1018 (1995).  The unreasonableness of a restraint is determined using either a per se standard or a standard that examines all of the circumstances, the so-called rule of reason test.  See Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988).  Under the per se standard, conduct that is "manifestly anticompetitive" or "would always or almost always tend to restrict competition," id. (internal quotations and citation omitted), is conclusively presumed to restrain competition unreasonably "'without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use.'"  Rossi v. Standard Roofing, Inc., 156 F.3d 452, 461 (3d Cir. 1998) (quoting Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958)).  Practices that have been held to be illegal per se include price fixing, division of markets, group boycotts, and tying arrangements.  See Arizona v. Maricopa County Med. Soc., 457 U.S. 332, 344 n.15 (1982); Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 558 (8th Cir. 1998).

Because the boat builders have not alleged that Brunswick engaged in activity that would trigger a per se analysis, we apply the rule of reason analysis that focuses on the "particular facts disclosed by the record," Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 467 (1992) (internal quotations and citation omitted), and "weigh[] all of the circumstances . . .  in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition," Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).

The boat builders' Section 1 theory is that Brunswick violated the law by means

-30-

of its agreements or contracts. They argue that Brunswick's market share discount programs created an unreasonable restraint of trade in violation of Section 1. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961); Standard Oil Co. v. United States, 221 U.S. 1 (1911). It is undisputed that the market share discounts were not exclusive contracts. At most the programs were de facto exclusive dealing arrangements. Dr. Hall testified at trial that the discount programs were "voluntary contracts. Nobody forced the boatmakers individually to accept these. They accepted these contracts because they individually got a deal from it. They got their discounts if they bought a lot of Brunswick engines." Tr. at 1173-74.

Section 1 claims that allege only de facto exclusive dealing may be viable. See Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1301-02 (9th Cir.), cert. denied, 459 U.S. 1009 (1982). The principle criteria used to evaluate the reasonableness of a contractual arrangement include the extent to which competition has been foreclosed in a substantial share of the relevant market, the duration of any exclusive arrangement, and the height of entry barriers. See Tampa Elec. Co., 365 U.S. at 327; Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1233-35 (8th Cir. 1987), cert. denied, 484 U.S. 1026 (1988); see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) (reasonableness of the restraint on trade in exclusive dealing cases depends upon whether a "significant fraction of buyers or sellers are frozen out of a market").

The boat builders failed to produce sufficient evidence to demonstrate that Brunswick had foreclosed a substantial share of the stern drive engine market through anticompetitive conduct. They also did not demonstrate that Brunswick's discount program was in any way exclusive. The programs did not require the boat builders to commit to Brunswick for any specified period of time. See Rowland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 395 (7th Cir. 1984) (contracts terminable in less than a year presumptively lawful). They were free to walk away from the discounts at any time, and they in fact switched to OMC engines at various points when that

manufacturer offered superior discounts.  One of the boat builders' witnesses testified, for example, that he had switched from 80% Brunswick engines to 70-80% OMC engines between 1988 and 1991 because OMC was offering better prices.  See Tr. at 327.  Another witness testified in his deposition that his boat building employer had switched from 90% Brunswick to 80% OMC in 1993 because of OMC's favorable pricing.  See Def.'s Ex. 3466; cf. SMS Sys. Maintenance Servs., Inc., 188 F.3d at 19-20 (rejecting Sherman Act Section 2 monopolization claim that defendant used generous warranty contracts to lock in customers where the customers' actual behavior indicated they were willing and able to switch to other suppliers).

The boat builders also did not show that significant barriers to entry existed in the stern drive engine market.  If entry barriers to new firms are not significant, it may be difficult for even a monopoly company to control prices through some type of exclusive dealing arrangement because a new firm or firms easily can enter the market to challenge it.  Cf. Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 597-98 (8th Cir. 1987), cert. denied, 484 U.S. 1010 (1988) (predatory price claim rejected where there was no evidence of a "drastically declining price structure" or of increasing concentration in the market (internal quotations and citation omitted)).  If there are significant entry barriers in the market, a potential competitor would have difficulty entering in order to challenge a firm that is charging supracompetitive high prices.  See id.  A significant barrier to entry may exist when large amounts of capital would be required.  See Mississippi River Corp. v. F.T.C., 454 F.2d 1083, 1092 (8th Cir. 1972).  The boat builders presented scant evidence that firms have difficulty entering the stern drive engine manufacturing market.  They suggest that engine manufacturing is a capital intensive business, but Dr. Hall testified that various companies are capable of assembling stern drive engines and of overcoming whatever entry barriers might exist.  He noted that Toyota had entered the market recently and was on its way to competing with established manufacturers like Brunswick and OMC/Volvo.  Brunswick's discounts, because they were significantly above cost, left ample room for new competitors such as Toyota to enter the engine manufacturing

market and to lure customers away by offering superior discounts.

In sum, the boat builders failed to establish Section 1 violations or a sufficient causal connection between the alleged violations and their injuries. In order to make out their case they had to produce evidence to show that Brunswick's market share discount programs were an unreasonable contractual arrangement, based on the amount of market foreclosure, exclusivity, and the erection of entry barriers. See Tampa Elec. Co., 365 U.S. at 325-29. The boat builders have not shown that a reasonable jury could have found that Brunswick's programs, which were not exclusionary, caused harm in the first instance, or that they were a "material cause" of any harm allegedly suffered. National Ass'n of Review Appraisers & Mortgage Underwriters, Inc. v. Appraisal Found., 64 F.3d 1130, 1135 (8th Cir. 1995), cert. denied, 517 U.S. 1189 (1996) (summary judgment affirmed where defendant's allegedly anticompetitive conduct was not a material cause of plaintiff's injury); see also Amerinet, 972 F.2d at 1494 (summary judgment affirmed where plaintiff failed to provide sufficient evidence of antitrust injury, causation, and damages). The boat builders also failed to account for "numerous intervening economic and market factors which . . . may have been the actual cause of the plaintiffs' injuries," such as market share gains related to competitors' mistakes. Greater Rockford Energy & Tech. Corp. v. Shell Oil Co., 998 F.2d 391, 402 (7th Cir. 1993), cert. denied, 510 U.S. 1111 (1994) (summary judgment affirmed where "as a matter of law, plaintiffs have failed to show with a fair degree of certainty that the antitrust violation was a material and substantial factor causing their alleged injuries").

2.

Section 2 of the Sherman Act prohibits "monopoliz[ing], or attempt[ing] to monopolize . . . any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2 (1994). To establish a Section 2 violation, plaintiffs must show that 1) the defendant possessed monopoly power in the relevant market and 2) the defendant

willfully acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result "of a superior product, business acumen, or historical accident." United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); see also Morgan v. Ponder, 892 F.2d 1355, 1358 (8th Cir. 1989).  Monopoly power is defined as "the power to control prices or exclude competition." United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391 (1956).

The boat builders argue that the discount programs and acquisitions were part of a deliberate plan to exclude competitors from the stern drive engine market, and that this exclusion enabled Brunswick to charge supracompetitive high prices for its engines.  As with the Section 1 claim, the boat builders point to evidence they say shows that when Brunswick was threatened in the mid-1980s with OMC's new Cobra engine and with increasing competition from other engine manufacturers, it offered market share discounts and acquired Bayliner and Sea Ray in an effort to avoid competition on the merits.  They also allege that Brunswick attempted to erect and maintain barriers to entry and to place its customers in "golden handcuffs," such that boat builders and dealers had no choice but to purchase engines from it.

The Supreme Court "has urged great caution and a skeptical eye when dealing with unfair pricing claims." Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 343 (8th Cir. 1995).  This is because "[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.  Hence, they cannot give rise to antitrust injury." Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 (1990) (rejecting Section 1 claim that a maximum price fixing conspiracy caused antitrust injury when the prices were fixed above a predatory level).  In the absence of predatory prices,[13] any losses caused by

---

[13]Predatory pricing occurs when "'a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in.'" Morgan, 892 F.2d at 1358

-34-

pricing "cannot be said to stem from an *anticompetitive* aspect of the defendant's conduct. It is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." Id. at 340-41 (emphasis in original) (internal quotations and citations omitted).

Because cutting prices in order to increase business often is the very essence of competition, which antitrust laws were designed to encourage, it "is beyond the practical ability of a judicial tribunal to control [above cost discounting] without courting intolerable risks of chilling legitimate price cutting." Brooke Group Ltd., 509 U.S. at 223 (citation omitted); see also Matsushita Elec. Indus. Co., 475 U.S. at 594 (emphasizing the pro-competitive effect of above cost discounting); Morgan, 892 F.2d at 1359-63; Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230-36 (1st Cir. 1983). To hold otherwise "would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result . . . ." Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 116 (1986). If a firm has discounted prices to a level that remains above the firm's average variable cost, "the plaintiff must overcome a strong presumption of legality by showing other

---

(quoting Matsushita Elec. Indus. Co., 475 U.S. at 584 n.8. Determining whether price cutting is predatory is not a simple inquiry:

> The difficulty, of course, is distinguishing highly competitive pricing from predatory pricing. A firm that cuts its prices or substantially reduces its profit margin is not necessarily engaging in predatory pricing. It may simply be responding to new competition, or to a downturn in market demand. Indeed, there is a real danger in mislabeling such practices as predatory, because consumers generally benefit from the low prices resulting from aggressive price competition.

Morgan, 892 F.2d at 1358-59 (citing Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 231 (1st Cir. 1983)). There is no allegation that Brunswick engaged in predatory pricing.

factors indicating that the price charged is anticompetitive." Morgan, 892 F.2d at 1360. This is because a firm's ability to offer above cost discounts is attributable to "the lower cost structure of the alleged predator, and so represents competition on the merits . . . ." Brooke Group Ltd., 509 U.S. at 223.

The decisions of the Supreme Court in Brooke Group and Matsushita illustrate the general rule that above cost discounting is not anticompetitive. In Brooke Group Ltd. the trial court had granted the defendants' motion for judgment overturning a $49.6 million verdict after a 115 day trial with nearly 3000 exhibits. See Liggett Group, Inc. v. Brown & Williamson Tobacco Corp., 748 F. Supp. 344, 348 (M.D.N.C. 1990), aff'd, 964 F.2d 335, 336 (4th Cir. 1992), aff'd sub nom., Brooke Group Ltd., 509 U.S. at 219. The plaintiff had failed to demonstrate that the defendants had caused injury to competition. See Brooke Group Ltd., 509 U.S. at 243. The Court pointed out that

> [a]lthough [the plaintiff's] theory of liability, as an abstract matter, is within the reach of the statute . . . . [The plaintiff] was not entitled to submit its case to the jury. . . . The record in this case demonstrates that the anticompetitive scheme [the plaintiff] alleged, when judged against the realities of the market, does not provide an adequate basis for a finding of liability.

Id. at 230 (citations omitted). In Matsushita the Court remanded a predatory pricing conspiracy case for entry of summary judgment for the defendants unless

> there is other evidence that is sufficiently unambiguous to permit a trier of fact to find that [the defendants] conspired to price predatorily for two decades despite the absence of any apparent motive to do so. The evidence must "ten[d] to exclude the possibility" that [the defendants] underpriced [the plaintiffs] to compete for business rather than to implement an economically senseless conspiracy.

Matsushita, 475 U.S. at 597-98. In both of these cases the Supreme Court put the focus on the actual facts or realities of the marketplace rather than on hypotheticals.

No one argues in this case that Brunswick's discounts drove the engine price below cost, and Brunswick contends that its discounts were therefore per se lawful. The district court questioned Brunswick's per se legality theory, since the boat builders' claim was that Brunswick's conduct as a whole, including the discounts and acquisitions, enabled it to "charge[] anticompetitive *high* prices for its engines." Concord Boat Corp., 21 F. Supp.2d at 929 (emphasis in original). The court examined several cases that had "rejected the argument that *any* pricing practice that leads to above costs prices is *per se* lawful under the antitrust laws." Id. (emphasis in original); see LePage's Inc. v. 3M, No. Civ.A 97-3983, 1997 WL 734005 (E.D. Pa. Nov. 14, 1997) (bundling discounts on several product purchased together); SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir.), cert. denied, 439 U.S. 838 (1978) (pricing scheme linking monopolistic product with another competitive product violated Section 2); Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc., 920 F. Supp. 455, 467 (S.D.N.Y. 1996) (refusing to dismiss Section 2 bundling claims even though defendant not accused of pricing below cost because "average variable cost is the controlling standard in this Circuit [only for] single product cases"). The cases examined by the district court all involve bundling or tying, however, which "cannot exist unless two separate product markets have been linked." Jefferson Parish Hosp. Dist. No. 2, 466 U.S. at 21. Because only one product, stern drive engines, is at issue here and there are no allegations of tying or bundling with another product, we do not find these cases persuasive.

The boat builders also have not shown that Brunswick's superior market share was achieved or maintained "by means other than the competition on the merits . . . ." Sterns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 522 (5th Cir. 1999) (citing Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985)); see also Grinnell Corp., 384 U.S. at 570-71. A Section 2 defendant's proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits. See Sterns Airport Equip. Co., 170 F.3d at 522; see also Grinnell Corp., 384 U.S. at 570-71. Section 2 claims cannot succeed if a

defendant's dominant market share resulted from "a superior product, business acumen, or historical accident." <u>Grinnell Corp.</u>, 384 U.S. at 571. On the other hand, if the conduct "has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." <u>Sterns Airport Equip. Co.</u>, 170 F.3d at 522.

Brunswick's business justification in this case is that it was trying to sell its product. <u>Cf.</u> <u>id.</u> at 524. Cutting prices is the "very essence of competition." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 594. Brunswick's competitors also cut prices in order to attract additional business, confirming that such a practice was a normal competitive tool within the stern drive manufacturing industry. <u>See</u> <u>id.</u>; <u>see also</u> <u>Trace X Chem., Inc. v. Canadian Indus., Ltd.</u>, 738 F.2d 261, 266 (8th Cir. 1984), <u>cert. denied</u>, 469 U.S. 1160 (1985) ("Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2."). In addition, Brunswick's discount programs were not exclusive dealing contracts and its customers were not required either to purchase 100% from Brunswick or to refrain from purchasing from competitors in order to receive the discount (and in fact could purchase up to 40% of requirements from other sellers without forgoing the discount). <u>See</u> <u>Western Parcel Express v. United Parcel Serv. of Am., Inc.</u>, 190 F.3d 974, 976 (9th Cir. 1999) (affirming summary judgment for defendant in Section 2 predatory pricing and exclusive dealing case where the challenged volume discount contracts were terminable "for any reason with very little notice" and did not foreclose customers from entering into contracts with the defendant's competitors). Boat builders and dealers were free to walk away from Brunswick's discounts at any time, <u>see</u> <u>id.</u>, and the evidence showed that they did so when Brunswick's competitors offered better discounts, thus discrediting the boat builders' theory that the discounts created "golden handcuffs" and entry barriers for other engine manufacturers.

C.

Giving the boat builders the benefit to which they are entitled of all legitimate inferences, they did not offer sufficient evidence to enable a jury to determine that Brunswick's market share discount programs and acquisitions were anticompetitive. Even considering the erroneously admitted testimony of Dr. Hall, the boat builders failed to offer a "legally sufficient evidentiary basis for a reasonable jury to find for [them]." Weisgram, ---U.S.---, 120 S. Ct. at 1020 (internal quotations and citation omitted). They did not establish antitrust injury or causation with respect to either Sherman Act claim. The boat builders had a "full and fair opportunity to present [their] case," and the record evidence was insufficient to justify the verdict. Id. at 1015. Brunswick is therefore entitled to judgment as a matter of law on the Sherman Act claims.

V.

After a careful review of the voluminous record in this case, we conclude that the judgment for the boat builders cannot be upheld and that Brunswick is entitled to entry of judgment in its favor. Since the boat builders did not file their case until more than four years after the accrual of their cause of action under the Clayton Act and no exception to the running of the limitations period applies, the Section 7 claims should have been dismissed rather than submitted to the jury. We also conclude that the boat builders did not make out submissible Sherman Act claims. We therefore reverse and vacate the judgment in favor of the boat builders, including the award of fees and costs, and remand for entry of judgment in favor of Brunswick.[14]

_____

[14]This resolution moots Brunswick's motion for a new trial, as well as the cross appeal of the boat builders from the denial of their motion for equitable relief, and we need not address these issues further.

A true copy.

   Attest:

      CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

The relevant portion of the verdict form with the jury's answers follows:

PART I        Plaintiffs' Antitrust Claims

1.      Do you find from a preponderance of the evidence that Plaintiffs have proved a relevant product market?
        YES  ✓  NO____

2.      If you answered "NO" to Question1 then go to PART II. If you answered "YES" to Question 1, place an "X" next to the following engines that you find by a preponderance of the evidence to be in the relevant product market:
        ✓       stern drive engines
        ____    outboard engines
        ✓       inboard engines
        ____    jet engines

3.      Do you find from a preponderance of the evidence that Brunswick monopolized that market in violation of Section 2 of the Sherman Act?
        YES  ✓  NO____

4.      Do you find from a preponderance of the evidence that Brunswick engaged in an unreasonable restraint of trade in that market in violation of Section 1 of the Sherman Act?
        YES  ✓  NO____

5.      Do you find from a preponderance of the evidence Brunswick engaged in acquisitions which had the effect of substantially lessening competition in that market, or tending to create a monopoly in that market, in violation of Section 7 of the Clayton Act?
        YES  ✓  NO____

6.      If you answered YES to either question 3, or question 4, or question 5 (or answered yes to more than one of those questions) what, if any, damages did the Plaintiffs suffer (or will suffer) as a result of Brunswick's antitrust violation or violations in that market?  Use Chart 1 to fill in the damages, if any, suffered (or to be suffered) by each of the Plaintiffs during each

of the following time periods:

a. *From* December 7, 1991 *through* the date of verdict; and
b. *After* the date of verdict.

CHART 1

| Plaintiff | For Time Period to December 7, 1991 | For Time Period December 7, 1991 Through the Date of Verdict | For Time Period After the Date of Verdict |
|---|---|---|---|
| Albemarle Boats, Inc. | $0 | $83,282 | $0 |
| Armada Manufacturing | $0 | $2,646,611 | $0 |
| Caravelle Boats, Inc. | $0 | $4,887,179 | $0 |
| Campion Marine, Inc. | $0 | $1,196,286 | $0 |
| Century Craft Industries (Vanguard Industries) | $0 | $39,168 Vanguard $19,348 Century | $0 |
| Concord Boat Corp. | $0 | $106,459 | $0 |
| F R P Industries | $0 | $468,163 | $0 |
| G.W. Invader | $0 | $460,597 | $0 |
| Galaxie Boatworks | $0 | $395,362 | $0 |
| Harris Kayot | $0 | $1,644,706 | $0 |
| KCS International | $0 | $3,389,006 | $0 |
| Malibu Boats | $0 | $5,036,468 | $0 |
| Mariah Boats, Inc. | $0 | $16,626,171 | $0 |
| Mirage Boats, Inc. | $0 | $824,028 | $0 |
| Ohio Marine Dist. (Play Time) | $0 | $6,428 | $0 |
| Powerquest Boats, Inc. | $0 | $2,618,335 | $0 |
| Sea Arrow Marine, Inc. | $0 | $15,065 | $0 |
| Silverton Mar. Corp. | $0 | $1,566,672 | $0 |

| Plaintiff | For Time Period to December 7, 1991 | For Time Period December 7, 1991 Through the Date of Verdict | For Time Period After the Date of Verdict |
|---|---|---|---|
| Thompson Boat Co. | $0 | $2,324,365 | $0 |
| Weeres Industries | $0 | $18,062 | $0 |

7.    Do you find by a preponderance of the evidence that one or more Plaintiffs are entitled to recover damages for the time period prior to December 7, 1991?
YES___    NO _✓_


. . . .


PART II      Brunswick's Section 1 Counterclaim

10.    Do you find by a preponderance of the evidence that any of the Plaintiffs engaged in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act?
YES___    NO _✓_